**Edward John BENAVIDES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–94–00987–CR**

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 25, 1999.

Dissenting Opinion On Rehearing by
Justice O'Connor May 13, 1999.

512

D. Jennings Bryant, Jr., La Porte, Henry L. Burkholder, III, Houston, for appellant.

John B. Holmes, Kevin P. Yeary, Houston, for appellee.

Before Justices COHEN, O'CONNOR, and ANDELL.

## OPINION

MURRY B. COHEN, Justice.

Appellant was indicted for capital murder. A jury convicted him of murder and assessed punishment at life imprisonment. Appellant contends the evidence was insufficient; the judge should have instructed the jury on the lesser included offense of voluntary manslaughter; and the judge erred by admitting extraneous offense type evidence. We affirm.

### Facts

This case involves two raids of the same property. Although appellant was charged with the murder that occurred during the second raid, the facts of the first raid are important.

### A. The First Raid

At 7:45 p.m. on August 12, 1993, the Harris County Organized Crime Task Force and the Houston Police Department SWAT team executed a warrant searching for cocaine (the first search). An informant had made a controlled cocaine purchase at the premises three days earlier and had previously purchased one-quarter kilogram of cocaine there. The premises searched consisted of four buildings—designated A through D at trial—surrounded by a fence. Houston Police Officer Mark Scales threw a "distraction device"—a light and sound bomb commonly called a "flash bang"—into building B, a house trailer. The officers found appellant in building B and handcuffed him, and they temporarily detained him while executing the warrant. Appellant was startled by the distraction device, but Officer Scales told him not to be concerned. Appellant was not arrested. Harris County Sheriff's Deputy Eleanor Marie Brown testified she heard appellant say that somebody could have been hurt or shot during the raid, but

she did not think appellant was making a threat. Veronica Alvarado, who lived in building B, testified appellant told her and her children during the raid to calm down, or somebody might get hurt.

During the first raid, the police found in building A[1] a shotgun, .45 caliber handgun, and a drug ledger, and they arrested another person. The police also found 11 pistols and rifles in appellant's car and over $59,000, more than three-fourths of which was later attributed to appellant in a civil forfeiture judgment. They also seized "numerous military assault weapons," according to a subsequent search warrant affidavit. Narcotics dogs "alerted" on several locations in three of the buildings and on several vehicles in the yard. While officers were searching, they answered five telephone calls; three of the calls were from people ordering drugs.

### B. The Second Raid

At 5:30 a.m. on November 5, 1993, the officers executed another warrant searching the same premises for cocaine (the second raid). The raid team consisted of approximately 40 officers from the Harris County Organized Task Force and the Pasadena and Baytown Police Department SWAT teams. The raid team was under the command of Houston Police Department Sergeant R.J. Cuevas. Pasadena SWAT officers were assigned to search building A, the residence, and Baytown SWAT officers were assigned to search building B, the trailer. The raid was in response to information that a large sum of cash had been exchanged on the premises for cocaine on November 1. The search warrant described a suspect who resembled appellant.

The Pasadena SWAT officers wore dark gray camouflage, including dark gray ski-mask hoods, helmets, and goggles, and carried MP5 submachine guns. The MP5s had attached tactical lights, which the raid team members would turn on as they en-

1. Building A was a residence.

tered a building. On the night of the second raid, Officer Les Early's MP5 was the only gun that had a red, as opposed to white, lens on the tactical light. Officer Early used a red lens because the smoke from the distraction devices would reflect back white light. The camouflage gear did not have "police" written on it or any similar words that would identify the raid team members as peace officers. There were no lights on in building A before and during the raid, and the window blinds were closed. It was very dark at the time of the raid, and there was very little ambient light.

The raid team used bolt cutters to cut the heavy chain and padlock that secured the gate to the fence around the premises. Once inside the premises, the Pasadena SWAT team used a tow truck to pull burglar bars off the front door of building A. At the same time the bars were pulled off, Pasadena Police Sergeant Steve Devillier broke the window to the right of the door and yelled "Police," Pasadena Police Officer John R. Dombroa threw in a distraction device, and another officer threw in a second distraction device. The purpose of the distraction devices was to distract and disorient anyone inside the room. Although the devices were not powerful enough to cause blindness or deafness, they would impair a person's hearing for a few seconds. The two distraction devices detonated almost simultaneously. The officers carried a battering ram, but the door was unlocked.

The victim, Officer Leslie Early, was the first team member to enter building A, and he went to the right after entering. Officer Early's MP5 was equipped with a silencer for "suppressed fire." Sergeant Cuevas heard someone yell, "Police, get down." Pasadena Police Officer Steven Brown was the second SWAT team member to enter building A, and he went to the left after entering. Officer Brown testified that both he and Officer Early yelled "Police" when they entered. Pasadena Police

Officer James M. Ford was the third SWAT team member to enter building A, and he also yelled "Police" when he entered. Police Officers Gene Keen and Daniel Wayne Pennington were the fourth and fifth SWAT team members to enter building A. Pasadena Police Officer Steven Johnson also entered building A.

Officer Ford heard Officer Early's gun discharge and then saw Early backing out of the front right room, saying he was hurt. Moreover, Officer Stephen Johnson testified that only three seconds elapsed from the time he dropped the battering ram and entered the building behind Officer Early until Early came backing out. Using the light source on his gun, Officer Ford saw appellant in the front right room. The lights were off in the room. Officer Ford could see, despite the smoke from the distraction device's discharge, because the smoke initially goes to the top of the room, then settles down after a few seconds. Appellant was on his knees on a bed, his hands were up in the air, and he yelled, "Okay, okay, okay, don't shoot, don't shoot." Officer Ford did not see a gun in appellant's hand. At that time, Officer Pennington came into the room and "covered" appellant. Officer Pennington did not hear any weapon discharge before he came into the room. Officer Brown, who went to the left front room, heard Officer Early say, "I'm down, I'm out." Officer Brown went to Officer Early, pushed him out towards the front door, and then went to the right front room. After the smoke from the distraction device cleared, Officer Brown saw appellant on a bed, with a gun lying nearby.

After the distraction device went off in the front right room of building A, Sergeant Devillier saw appellant through the window. Appellant was sitting on his knees on a bed, with his hands up, wearing night wear. Sergeant Devillier also saw Officer Pennington pointing a gun at appellant. Sergeant Devillier did not see appellant fire a gun, but he knew Officer Early fired his gun. Officer Keen encountered Officer Early as Early was staggering backwards. Officer Keen then went to the right front room and saw appellant kneeling on a bed with his hands in the air. Appellant told one of the officers that he thought the raid officers were "crash burglars."[2] Officer Keen did not hear any gunfire.

Officers Johnson and Pennington were originally assigned to batter in the front door with a ram. When they discovered the door was unlocked, they entered building A. Officer Johnson encountered Officer Early staggering out of the building. Pasadena Police Sergeant Kevin Wingerson testified that approximately 20 seconds elapsed from the time the two distraction devices discharged to the time the building was secured and the "all clear" signal was given.

Sergeant Wayman Allen, Jr., a Houston Police Department homicide investigator, arrived at the scene at 6:30 a.m. He found four bullet holes near appellant's bed and four spent shell casings that came from Officer Early's gun. Sergeant Allen also recovered a gun wedged between the bed's headboard and mattress, and one spent shell casing from it. The medical examiner testified that Officer Early died from a single gunshot wound.

Officer C.E. Anderson, a Houston Police Department firearms examiner, testified that the bullet recovered from Officer Early's body was fired from the gun found in the bedroom. He also testified that two bullets found near the bed were fired from Officer Early's gun. Robert Reynolds, a Houston Police Department criminalist, conducted an atomic absorption test on samples taken from appellant's hands.

**2.** Veronica Alvarado, a resident of the compound, testified that "fake police" raided the premises in July 1993. At least one person wore a windbreaker with sheriff department markings, and the "policemen" threatened her and others with guns. Appellant was not present during the fake raid, but he was told what happened. Alvarado admitted that no complaint was ever made to the police about the "fake police" raid.

Reynolds did not find any metal or gunpowder residue on appellant's hands, but he stated that the test was not conclusive.

The search turned up $289,840 in cash, 15 guns, 31 pieces of gold jewelry, ledgers recording drug transactions, and 22 "pyro pops." An agreed civil forfeiture judgment states that appellant owned 75 percent of the cash. Appellant did not testify at trial.

The jury had the option to convict appellant of capital murder, murder, involuntary manslaughter, and criminally negligent homicide. The jury rejected his self-defense plea and convicted him of murder.

### Legal and Factual Sufficiency of the Evidence—Self–Defense

In point of error three, appellant contends the evidence is legally insufficient to support his conviction for murder because the State did not disprove that appellant acted in self-defense or defense of property. The critical inquiry on review of the legal sufficiency of the evidence to support a criminal conviction is whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. This inquiry does not require this Court to ask whether we believe that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Santellan v. State,* 939 S.W.2d 155, 160 (Tex.Crim.App.1997); *Howley v. State,* 943 S.W.2d 152, 155 (Tex.App.—Houston [1st Dist.] 1997, no pet.).

■ There is a threshold issue concerning the standard of review that affects points of error one and three. Appellant was charged with capital murder, but the jury acquitted him of that and convicted him of the lesser included offense of murder. Appellant contends we should evaluate sufficiency of the evidence of murder in light of the verdict of acquittal for capital murder. He contends the jury could have acquitted him only because it found he did not know Officer Early was a peace officer or because it had a reasonable doubt that he knew Early was a peace officer, and in either case, he would have been acting in self-defense. Appellant points to the jury charge in the clerk's record before us, which lists four elements of capital murder, and observes there is a check mark ( ) next to element one (that appellant intentionally caused Early's death), element two (that Early was a peace officer), and element four (that Early was acting in the lawful discharge of an official duty), but no check mark next to the third element (appellant knew that Early was a peace officer). Appellant contends that if the jury doubted that appellant knew Early was a peace officer, the jury had to believe or have a reasonable doubt that appellant was acting in self-defense.

We disagree for several reasons. First, the result on appeal cannot depend on the presence or absence of check marks on the jury charge. We do not know who put them there, when, or why. "The verdict in every criminal action must be general," not upon special issues, and that principle of law cannot be avoided by the presence of checks on the jury charge. *See* Tex.Code Crim. P. Ann. art. 37.07, § 1(a) (Vernon 1981).

Second, appellant cites no case holding that a jury's acquittal of a greater offense is "evidence" that undermines its guilty verdict in the same case on a lesser offense. The jury's verdict is not evidence, and it is sufficiency of the evidence supporting the verdict of guilty to murder that we are reviewing.

Third, we do not agree that the jury necessarily doubted that appellant knew Early was a peace officer. It was undisputed that Early was a police officer, but every other element was contested.[3] In final argument, appellant argued at length that he did not shoot Early. Almost all the argument was devoted to showing that Early was killed by "friendly fire" of a fellow police officer.[4]

▮ Because criminal verdicts must be general, there is in criminal law no doctrine, as in civil cases, requiring a new trial when conflicting jury answers cannot be reconciled. *See United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997) (jury cannot be said to have "necessarily rejected" any facts when it returns general verdict of not guilty); *United States v. Powell*, 469 U.S. 57, 65, 105 S.Ct. 471, 476–77, 83 L.Ed.2d 461 (1984) (defendant may not challenge inconsistent verdicts, even when jury acquits defendant of predicate offense while convicting of compound offense; inconsistency may be result of jury lenity). In any event, appellant, unlike a civil litigant, does not seek a new trial based on explicitly conflicting answers to special issues. Rather, he requests a greater remedy, an acquittal, based on implicitly conflicting verdicts on general issues. Our criminal law recognizes no such remedy.

Finally, the jury was instructed on the doctrine of mistake of fact, *i.e.*, that if appellant believed Early was a burglar or the jury had a reasonable doubt thereof, it should acquit. Thus, whatever implicit conflict there may be between acquittal of capital murder and conviction for murder, the jury was expressly required to confront and reject appellant's theory that he thought Early was a burglar by at least three separate instructions (self-defense, sudden passion arising from adequate cause, and mistake of fact) before convicting him of murder.

In *Moore v. State*, 969 S.W.2d 4 (Tex. Crim.App.1998), the Court of Criminal Appeals quoted the United States Supreme Court for the proposition that "the jury's role in the criminal process is essentially unreviewable and not always rational."

---

**3.** For example, the jury was instructed, "The use of force greater than necessary by an officer, in effecting an arrest or search, is unlawful force, and if such force greater than necessary is deadly force, then it is unlawful deadly force." Thus, there was a fact question, which was submitted at appellant's request, about whether Early was acting "in the lawful discharge of official duty." On appeal, appellant does not contend that this issue entitles him to acquittal or that by acquitting him of capital murder, the jury necessarily decided that issue in his favor. We mention this only to show how difficult it would be under these facts to confidently attribute the jury's action to any particular fact finding. The jury could have believed, as the charge allowed, that the police used "force greater than necessary (which) is unlawful force," and therefore Early was not acting in "the lawful discharge of an official duty," but that appellant knew Early was a peace officer and therefore appellant's own use of deadly force was also unreasonable.

**4.** During final argument, neither counsel for appellant mentioned "self-defense" or "sudden passion." Almost the entire argument was that another officer shot Early and then altered the evidence and the crime scene to hide that fact. The State argued that the jury's biggest problem would be to decide if appellant knew Early was an officer. Defense counsel denied that immediately and emphatically. He argued:

> So I will begin by saying that Mr. Hawkins told you that he thought the biggest problem you were going to have is to determine whether or not Les—whether or not the defendant, John Edward Benavides knew that Les Early was a police officer. I don't believe that is the biggest problem you have. I don't think that's the first question that you have. I think the evidence raises ... Based upon the evidence, the question presented to you is who shot Les Early? You must decide from the evidence who shot Les Early. And until you decide beyond a reasonable doubt that the defendant shot Les Early, you would never get to any of the other issues in this matter.

Counsel later argued, "This excessive force thing, we are not even interested in that. The issues in this case are causation, knowledge, and intent." The "friendly fire" theory dominated the final argument of both defense counsel, to the near exclusion of other topics.

*Id.* at 13; *see Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d 340 (1984); *Beck v. Alabama*, 447 U.S. 625, 639–40, 100 S.Ct. 2382, 2390–91, 65 L.Ed.2d 392 (1980) (regarding jury nullification). We therefore decline to give the jury's verdict of acquittal on capital murder the type of collateral estoppel effect that appellant seeks,[5] and we decline to hold that, because the jury acquitted appellant of capital murder, it must have thought Early was a burglar and it was therefore bound to acquit appellant of murder, based on self-defense.

### Self–Defense—The Merits

■ Appellant claimed he was justified in using deadly force to defend himself under former Penal Code sections 9.31 and 9.32:

Sec. 9.31. Self–Defense

(a) Except as provided in Subsection (b) of this section, a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.

(b) The use of force against another is not justified:

(1) in response to verbal provocation alone;

(2) to resist an arrest or search that the actor knows is being made by a peace officer, or by a person acting in a peace officer's presence and at his direction, even though the arrest or search is unlawful, unless the resistance is justified under Subsection (c) of this section;

(3) if the actor consented to the exact force used or attempted by the other; or

(4) if the actor provoked the other's use or attempted use of unlawful force, unless:

(A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and

(B) the other nevertheless continues or attempts to continue to use unlawful force against the actor.

(c) The use of force to resist an arrest or search is justified:

(1) if, before the actor offers any resistance, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search; and

(2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer (or other person's) use or attempted use of greater force than necessary.

(d) The use of deadly force is not justified under this subchapter except as provided in Sections 9.32, 9.33, and 9.34 of this code.

Sec. 9.32. DEADLY FORCE IN DEFENSE OF PERSON. A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31 of this code;

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of aggravated kidnaping,

---

**5.** Collateral estoppel arises only from a final judgment. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *Garcia v. State*, 768 S.W.2d 726, 729–

30 (Tex.Crim.App.1987). There was no judgment, much less a final judgment, on the capital murder charge until after the jury's deliberations ended.

murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

Act of May 24, 1973, 63d Leg, R.S., ch. 399, sec. 1, § 9.31, 1973 Tex. Gen. Laws 883, 901 (TEX. PENAL CODE § 9.31, since amended); Act of May 29, 1983, 68th Leg, R.S., ch. 399, § 5, 1983 Tex. Gen. Laws 5311, 5316 (TEX. PENAL CODE § 9.32, since amended). The reasonableness of a defendant's belief that force was required to defend himself is viewed from the defendant's standpoint at the time he acted. *Juarez v. State*, 886 S.W.2d 511, 514 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

▪ In resolving the legal sufficiency of the evidence, we look not to whether the State presented evidence that refuted appellant's defensive testimony, but instead determine whether there was legally sufficient evidence to allow the jury to find the essential elements of the offense beyond a reasonable doubt and also to find against appellant on the defensive theories beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App.1991); *see* TEX. PENAL CODE ANN. § 2.03(d) (Vernon 1994) (if defense is submitted to jury, defendant must be acquitted if jury has reasonable doubt on defense). The standard of review for legal sufficiency in a self-defense case was stated by this court in *Green v. State*, 891 S.W.2d 289, 297 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd):

> It is not relevant whether the reviewing court believes the evidence or that it is "outweighed" by the opposing side's evidence, if there is any evidence that could establish guilt beyond a reasonable doubt, the conviction will not be reversed.... An appellate court is not to sit as the thirteenth juror, reweighing the evidence or deciding whether it believes the evidence established the element in contention beyond a reasonable doubt; rather it is to ask itself whether

the trier of fact, acting rationally, could have found the evidence sufficient to establish the element beyond a reasonable doubt.

▪ The record does not show exactly what took place between Officer Early and appellant in the bedroom of building A in the time between the officer's entry and the shooting. Viewed in the light most favorable to the State, the evidence shows appellant heard the bars being torn off the door, heard multiple yells of "Police," and saw and heard bombs—the distraction devices—discharge in the house. Within seconds,[6] appellant was confronted with a camouflaged man carrying an automatic weapon. The only light in the room was the red tactical light on Officer Early's gun. Although Early was well armed and highly trained, appellant was able, in spite of everything, to reach his gun, to avoid Early's four shots, and to kill Early with the only shot he fired.

▪ A rational jury could have found against appellant on the issue of self-defense. Much evidence was heard about the first raid of August 12, 1993. This was apparently admitted to show, under TEX. PENAL CODE ANN. § 9.31(c) (Vernon 1994), that officers were not using excessive force; that appellant, having experienced the August raid, could have recognized their tactics, *i.e.*, the use of "flash bangs"; and that considering the conduct of the police in August, appellant should not have feared unlawful and excessive force from them and therefore should not have responded with deadly force. Appellant contends much of this evidence was inadmissible, but both admissible and inadmissible evidence is considered in deciding whether the evidence was sufficient. *Porier v. State*, 662 S.W.2d 602, 606 (Tex.Crim.App. 1984).

**6.** As stated above, Officer Wingerson testified that approximately 20 seconds elapsed from the time the two distraction devices discharged until the building was secured and the "all clear" signal was given. Moreover, Officer Stephen Johnson testified that only three seconds elapsed from the time he dropped the battering ram and entered the building behind Officer Early until Early came backing out.

■ The evidence of weapons on the premises and in appellant's car, prior drug sales, drug ledgers, huge sums of cash mostly belonging to appellant, and civil forfeiture judgments against appellant resulting from these two raids supports the verdict because from it, a rational jury could infer that appellant was defending drugs and drugs proceeds from police as well as from burglars and was seeking to escape arrest, which tends to prove motive, intent, and knowledge. It also rebuts the defense of mistake of fact, which was submitted to the jury. *See Malone v. State,* 849 S.W.2d 414, 420 (Tex.App.—Beaumont 1993, no pet.) (evidence of gun in car with illegal drugs relevant to show motive to protect drugs, to show intent and knowledge, and to negate mistake of fact); *Hawkins v. State,* 871 S.W.2d 539, 541 (Tex. App.—Fort Worth 1994, no pet.) (pistol located near cocaine held admissible to show intent to protect cocaine).

Appellant knew about the weapons and money the police found on the premises in August. He knew that police tactics involved use of "flash bangs." Thus, when people shouting "Police" and using "flash bangs" again raided the premises; a rational jury could have believed that appellant, who had good reason to expect the police, should have believed they were the police. Because appellant did not testify, there was no direct evidence to the contrary. There was no direct evidence that he was asleep, that he did not know the raiders were police, or that he feared for his life from the police.

Justice O'Connor relies on the testimony of Virginia and Magdalena Alvarado that "fake police" raided the premises in July 1993 and appellant knew that. The jury is the sole judge of the credibility of the witnesses, and it may believe all, some, or none of any person's testimony. Moreover, we must review the evidence in the light most favorable to the jury's verdict.

The jury did not have to believe Alvarado's testimony, and there was reason not to believe it. She testified that no one ever reported the raid to the police. She testified that although appellant, who had been her neighbor for "quite a bit of years," was seen entering the fenced compound shortly after the fake police left, nobody told him about it until the next day, even though they all locked their doors in fear. As far as she knew, nobody ever told the police. Although robbery was the apparent motive for the fake police raid, the fake police took nothing. Virginia's mother, Magdelena Alvarado, testified the fake police threatened the family with weapons for half an hour, but she mentioned no physical injuries to anyone. She considered the offense "serious," but nobody ever reported it to the police.

■ In 1978, the United States Supreme Court ruled in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), that the sole remedy for insufficient evidence was acquittal, not a new trial as Texas law then provided. Since then, Texas courts have been unwilling to hold that self-defense was established as a matter of law, requiring acquittal. One intermediate court did. *Saxton v. State,* 776 S.W.2d 685 (Tex.App.—Houston [14th Dist.] 1989). Its judgment was reversed in *Saxton v. State,* 804 S.W.2d 910 (Tex.Crim.App. 1991), which emphatically held that despite Tex. Penal Code Ann. § 2.03(d) (Vernon 1994),[7] the State did not have to produce evidence disproving or refuting a claim of self-defense, even if all evidence supporting the defense was uncontradicted and consistent. *Id.* at 912 & nn. 3–4. The court held that Penal Code section 2.03(d) "addresses the mechanics of the jury charge vis-a-vis the State's burden of proof when a defensive issue has been raised by the evidence, rather than the sufficiency of the

7. Section 2.03(d) provides, "If the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted." Tex. Penal Code Ann. § 2.03(d) (Vernon 1994).

evidence." *Id.* at 913. It held the State's burden under section 2.03(d) "is not a burden of *production,* i.e., one which requires the State to affirmatively produce evidence refuting the self-defense claim, but rather a burden requiring the State to prove its case beyond a reasonable doubt." *Id.* (emphasis original). The court concluded that "more importantly, case law instructs us that the issue of self-defense is an issue of fact to be determined by the jury." *Id.* Thus, the issue is whether after reviewing all the evidence in the light *most* favorable to the prosecution, *any* rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *Id.* at 914.

Viewing the evidence in this manner, a rational jury could have (1) disbelieved the Alvarados' testimony about the fake police raid, (2) believed several officers' testimony that they shouted "Police" as they entered, (3) believed that appellant heard, understood, and believed the officers, there being no contrary evidence, and (4) concluded that appellant therefore did not reasonably believe that deadly force was immediately necessary to protect himself against Officer Early's use of unlawful deadly force. *See* TEX. PENAL CODE ANN. § 9.32(a)(3)(A) (Vernon Supp.1999).

In most self-defense cases, evidence of self-defense comes from defense witnesses. This case is unusual because except for the Alvarados' testimony, appellant, who did not testify, relies on the State's witnesses. While a rational jury certainly could have found that appellant believed he was under attack not by police but by burglars, this record does not show that a rational jury could have believed nothing else. Thus, it could have found against appellant on the issue of self-defense.

We overrule point of error three.

In point of error four, appellant contends the evidence on the issue of self-defense is factually insufficient. We have set out the facts extensively above. View-

ing them in the light required by *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App. 1996), we conclude that the evidence is factually sufficient.

We overrule point of error four.

## Legal and Factual Sufficiency of the Evidence—Sudden Passion

■ In point of error one, appellant contends the evidence of murder is legally insufficient because the State did not prove beyond a reasonable doubt that he was not acting under the influence of sudden passion arising from adequate cause. The charge instructed the jury as follows:

> Now, if you find from the evidence beyond a reasonable doubt that ... [appellant] did then and there unlawfully, intentionally or knowingly cause the death of Leslie Early, by shooting Leslie Early with a firearm, *and the [appellant], in so acting, was not acting under the immediate influence of sudden passion arising from an adequate cause,* then you will find the [appellant] guilty of murder. Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of murder and next consider whether [appellant] is guilty of involuntary manslaughter.

(Emphasis added).

The jury was instructed that before convicting appellant of murder, it had to find beyond a reasonable doubt that he did not kill while in a state of sudden passion. For murders like this one, occurring before September 1, 1994, the requirement to negate sudden passion *as an element of murder* was imposed by *Cobarrubio v. State,* 675 S.W.2d 749, 751 (Tex.Crim.App. 1983). That implied element of murder was deleted effective September 1, 1994 by legislation abolishing the offense of voluntary manslaughter and instead making the issue of "sudden passion arising from adequate cause" a punishment-stage issue for defendants found guilty of murder. *See* Act of May 29, 1993, 73d Leg., R.S., ch.

900, sec. 1.01, §§ 19.02(d) (addition of sudden passion as punishment-stage issue in murder prosecution), 19.04 (merging former offenses of voluntary and involuntary manslaughter into single offense of manslaughter and deleting sudden passion as element of offense), sec. 1.19(a) (effective date), 1993 Tex. Gen. Laws 3587, 3613–14, 3705.

This point of error is significantly affected by the recent decision in *Moore v. State,* 969 S.W.2d 4 (Tex.Crim.App.1998). Like this case, *Moore* concerned a murder committed before September 1, 1994. *Id.* at 6. Like appellant, Moore did not testify. *Id.* at 6–8. The issue on appeal was whether the defendant was entitled to a voluntary manslaughter instruction without "direct evidence" of sudden passion. *Id.* at 10. The court held that "direct evidence is neither needed nor usually available." *Id.* It overruled two 1986 cases holding to the contrary, *Gonzales v. State* and *Ojeda v. State,* and held that *Ojeda* "contradicted ... well settled law." *Moore,* 969 S.W.2d at 10; *Gonzales v. State,* 717 S.W.2d 355 (Tex.Crim.App. 1986); *Ojeda v. State,* 712 S.W.2d 742 (Tex.Crim.App.1986).

The *Moore* court overruled *Gonzales* in a significant way. In *Gonzales,* a murder case, the jury was instructed on self-defense but not on voluntary manslaughter, *i.e.,* "sudden passion," even though evidence showed the deceased shot at Gonzales from behind, without warning, just before Gonzales killed him. *Gonzales,* 717 S.W.2d at 356–57. Gonzales claimed he was entitled to the instruction because evidence raised a fact issue. The court of appeals reversed and held that the voluntary manslaughter (sudden passion) instruction should have been given. *Gonzales v. State,* 679 S.W.2d 638, 639–40 (Tex. App.—San Antonio 1984). Discretionary review was granted to decide whether the court of appeals erred "by creating an automatic right to an instruction on voluntary manslaughter [sudden passion] when-

ever self-defense is raised by the evidence." *Gonzales,* 717 S.W.2d at 356.

The Court of Criminal Appeals held that no voluntary manslaughter (sudden passion) issue was required. *Id.* at 358. Judge Clinton wrote a vigorous dissent, joined by two other judges. In *Moore,* the Court of Criminal Appeals not only overruled *Gonzales,* it also endorsed Judge Clinton's dissenting opinion in *Gonzales.* The *Moore* court stated, "*Gonzales* was an opinion for a plurality of the Court, and it was convincingly criticized in the dissenting opinion as being unfaithful to our prior decisions. It should not be relied on." 969 S.W.2d at 11.

In his dissenting opinion in *Gonzales,* Judge Clinton stated:

> The State complains that the court of appeals has created an automatic right to a voluntary manslaughter instruction whenever the issue of self-defense is raised. *Daniels [v. State,* 645 S.W.2d 459 (Tex.Crim.App.1983)] ... belies this contention. Nevertheless, it is true, as was long ago observed, that "where the case becomes involved from the issues raised, and it is claimed the killing resulted from a fight, and the facts of its inception or progress become controverted issues raising the question of self-defense, *it is a rare instance where the issue of manslaughter does not also become pertinent.*" *Lewis v. State,* 89 Tex.Crim 345, ... 231 S.W. [113][8] at 116 [(1921)].

*Gonzales,* 717 S.W.2d at 363 (emphasis added).

The citation to *Lewis* is significant. The issue in *Lewis,* a murder case, was whether the trial court, having instructed the jury on self-defense, erred by refusing to instruct on manslaughter. The court of criminal appeals held this was error. It stated, " 'In a doubtful case, the charge on manslaughter should be given.' 'After all the evidence is in, if it is questionable in

8. The correct citation is 231 S.W.

the court's mind as to whether the issue of manslaughter is raised, it should be resolved in the defendant's favor, and the matter passed to the jury.' " *Lewis,* 231 S.W. at 115 (citations omitted). The *Lewis* court then cited multiple authorities for its statement that when the facts raised self-defense, "it is a rare instance where the issue of manslaughter does not also become pertinent." *Id.* at 116.

■ The authorities from *Lewis* to the present day case of *Moore* show how hard it is to distinguish between evidence raising self-defense and evidence raising sudden passion. It would be "a rare instance" when issues of self-defense do not also raise issues of sudden passion. Because cases to the contrary, like *Ojeda* and *Gonzales,* were expressly overruled in *Moore,* trial courts, on request, are now generally well advised to give both instructions.

■ The opinions in *Moore* and *Lewis* affect this case. If, except in "a rare instance," the same evidence raising a fact issue on self-defense also raises an issue on "sudden passion," then it must also be true that, except in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion. Thus, the evidence discussed above [9] that would justify a finding against appellant on self-defense would also justify a finding that appellant was not acting under sudden passion. "Resolution of such a question is uniquely the province of the fact finder." *Gold v. State,* 736 S.W.2d 685, 690 (Tex.Crim.App.1987), *overruled on other grounds by Torres v. State,* 785 S.W.2d 824, 825 (Tex.Crim.App. 1990).

We overrule point of error one for the same reasons we overruled point of error three.

In point of error two, appellant contends the evidence is factually insufficient for the jury to have found against him on the issue of sudden passion. We have set out the jury charge above. The facts are extensively stated above. Appellant never testified. Thus, there is no direct evidence he acted under sudden passion and none to rebut the inferences described above. After viewing all the evidence under the standard required by *Clewis,* 922 S.W.2d at 134, we hold that the evidence was factually sufficient for the jury to find against appellant on the issue of sudden passion.

We overrule point of error two.

### Voluntary Manslaughter

In point of error five, appellant contends the trial court erred in failing to instruct the jury on voluntary manslaughter.

■ One commits voluntary manslaughter:

(a) ... [i]f he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, sec. 1, § 19.04(a)–(c), 1973 Tex.

---

**9.** Appellant had recently experienced a police raid that employed similar tactics; he presented no evidence he was incapable of cool reflection; he was in charge of a fortune in cash and an arsenal to protect it, suggesting he had the ability and will to do so; and he killed Officer Early with one shot while avoiding Early's four shots.

Gen. Laws 1122, 1124 (TEX. PENAL CODE § 19.04(a)–(c), since amended). "Sudden passion" has been described as an excited and agitated state of mind at the time of the killing caused by direct provocation by the victim. *Hobson v. State*, 644 S.W.2d 473, 478 n. 10 (Tex.Crim.App.1983); *Gonzales v. State*, 838 S.W.2d 848, 854 (Tex. App.—Houston [1st Dist.] 1992), *pet. dism'd, improvidently granted*, 864 S.W.2d 522 (Tex.Crim.App.1993).

Appellant requested a charge on voluntary manslaughter. The State objected, contending the evidence in this murder trial did not raise the *sometime* lesser included offense of voluntary manslaughter. *See Bradley v. State*, 688 S.W.2d 847, 851 (Tex.Crim.App.1985), *overruled on other grounds by Moore v. State*, 969 S.W.2d 4, 10 (Tex.Crim.App.1998).

■ An instruction on a lesser included offense is proper if: (1) proof of the charged offense includes proof of the lesser included offense and (2) some evidence shows the defendant is guilty only of the lesser included offense. *Havard v. State*, 800 S.W.2d 195, 215–16 (Tex.Crim.App. 1989); *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex.Crim.App.1985); *Gonzales*, 838 S.W.2d at 854.

■ Voluntary manslaughter is not always a lesser included offense of murder. In a murder prosecution, there must be some evidence of sudden passion before voluntary manslaughter is a lesser included offense. *Bradley*, 688 S.W.2d at 851; *Gonzales*, 838 S.W.2d at 854. If requested, the trial court must submit the charge on voluntary manslaughter if there is evidence showing (1) legally adequate cause that would produce anger, rage, resentment, or terror sufficient to make an ordinary person incapable of cool reflection and (2) the defendant's excited and agitated state of mind that could have arisen out of provocation by the victim at the time of the killing. *Gonzales*, 838 S.W.2d at 855. These principles guide our analysis:

The credibility of the evidence and whether it is controverted or conflicts with other evidence in the case may not be considered in determining whether a defensive charge or an instruction on a lesser included offense should be given. When evidence from any source raises an issue that a lesser included offense may have been committed and a jury charge on the issue is properly requested, the issue must be submitted to the jury. It is then the jury's duty, under the proper instructions, to determine whether the evidence is credible and supports the defense or the lesser included offense.

*Moore v. State*, 574 S.W.2d 122, 124 (Tex. Crim.App. [Panel Op.] 1978); *Gonzales*, 838 S.W.2d at 855.

■ In deciding whether sudden passion has been raised, we inquire whether there is any evidence, however weak, contested, or incredible, that could support a rational jury finding that the accused acted under the immediate influence of sudden passion arising from an adequate cause. *Gold*, 736 S.W.2d at 688; *Gonzales*, 838 S.W.2d at 854. Implicit in the *Gold* holding is the restriction that the evidence may not be so weak, contested, or incredible that it could not support such a finding by a rational jury. In other words, it is not the volume of evidence that controls, but the quality.

■ Appellant contends that the issue of "sudden passion" was sufficiently raised to justify submission of a jury charge instruction because of (1) his statement to Officer Keen that he thought the police were "crash burglars" and (2) the unusual circumstances under which the officers conducted the raid, *i.e.*, pulling off the front door with a tow truck, breaking windows, throwing distraction devices into the room, and entering the premises dressed in camouflage. We must decide whether this raises a fact issue on legally adequate cause, *i.e.*, "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary

temper, sufficient to render the mind incapable of cool reflection." Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, sec. 1, § 19.04(c), 1973 Tex. Gen. Laws 1122, 1124. We hold this evidence raised a fact issue because, based on it, a rational jury could have found that these circumstances were sufficient to render the mind incapable of cool reflection.[10] The jury could reasonably have concluded that appellant experienced great anger, rage, terror, and resentment. Accordingly, we hold the evidence was sufficient to submit a charge on voluntary manslaughter. *See Gonzales,* 838 S.W.2d at 856.

 The trial judge gave the murder charge required by *Cobarrubio v. State,* 675 S.W.2d 749, 751 n. 8 (Tex.Crim.App. 1983), but he refused to give the next paragraph of the charge shown in *Cobarrubio* at note 8, the one concerning voluntary manslaughter. Appellant objected to the omission from the charge, and the trial judge overruled the objection. Therefore, appellant need not show egregious harm; he must only show some harm, which means he is entitled to reversal unless the error was harmless. This does not mean, however, that every erroneous refusal to give a lesser included offense charge will result in reversal. Appellant must have suffered "some actual rather than theoretical harm" from the error. *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Crim.App.1986).

 Appellant's entire argument on this subject consists of the following:

Appellant has been harmed by virtue of his right to have the jury consider the issue in the first instance. *Roberts v. State,* 590 S.W.2d 498 (Tex.Crim.App. 1979); *Medlock v. State,* 591 S.W.2d 485 (Tex.Crim.App.1979). The fact that the trial court properly instructed the jury on the law of self-defense did not render the failure to instruct on voluntary man-

slaughter harmless. *Medlock v. State, supra.*

Appellant's argument suggests that every error of this type requires automatic reversal because it will always be true that if a judge had given a lesser included offense charge, the jury might have convicted appellant of the lesser offense. In fact, that possibility will often meet the standard of *Arline, i.e.,* it will often constitute some actual, rather than theoretical, harm. 721 S.W.2d at 351. For example, one of appellant's authorities, *Medlock,* resulted in a reversal without any discussion of harm. This case is different, however, because appellant did not suffer the harm suffered by the defendants in appellant's cases, *Medlock* and *Roberts.*

The *Roberts* opinion discussed harm, but that discussion shows why harm is absent in this case. The *Roberts* court stated:

The failure of the trial court to submit the charge on voluntary manslaughter left the jury with only the alternatives of finding appellant guilty of murder or freeing him. The law does not insist that an accused so situated suffer such extreme options when he points to a more moderate choice which may be made available.

590 S.W.2d at 502 (citation omitted).

Appellant's jury did not have only the extreme alternatives of finding him guilty of murder or freeing him. It also had the alternatives of finding him guilty of capital murder, involuntary manslaughter, and negligent homicide. *See Jiminez v. State,* 953 S.W.2d 293, 299–300 (Tex.App.—Austin 1997, pet. ref'd) (including some lesser included offenses in jury charge may reduce harm from erroneously excluding others). More important than that, however, the *murder instruction gave appellant the same protection he would have received from a charge on voluntary manslaughter.* As a condition of convicting appellant of

---

**10.** The State does not appear to contest the adequate cause element, but instead argues there is no evidence of the second element, whether appellant had an excited and agitated state of mind that could have arisen out of provocation by the victim at the time of the killing.

murder, the jury first had to find, beyond a reasonable doubt, that appellant was not acting under "sudden passion."

Both *Medlock* and *Roberts* were decided in 1979. Until *Cobarrubio* in 1983, no murder case had been reversed for failing to require the State to prove, *as an element of murder*, that the defendant was *not acting under sudden passion.* When *Roberts* and *Medlock* were decided, the eleven-year debate had not yet begun on the relationship between murder and voluntary manslaughter. The debate began in *Cobarrubio* in 1983 and ended with legislation (now TEX. PENAL CODE ANN. § 19.02(d) (Vernon 1994)), abolishing the offense of voluntary manslaughter and making sudden passion a punishment stage issue in murder trials.

The only difference between murder and the former offense of voluntary manslaughter was that voluntary manslaughter was murder committed under the immediate influence of sudden passion arising from adequate cause. *Braudrick v. State,* 572 S.W.2d 709, 710 (Tex.Crim.App. [Panel Op.] 1978). The charge in the present case required, *as an element of finding appellant guilty of murder,* that the jury find beyond a reasonable doubt that he was *not* acting under the immediate influence of sudden passion arising from adequate cause. A jury that found beyond a reasonable doubt that appellant was not acting under sudden passion would not need a second opportunity (one paragraph later) to find he was. That would have been the effect of giving this jury a voluntary manslaughter instruction. *See Cobarrubio,* 675 S.W.2d at 751 n. 8 (citing PAUL J. McCLUNG, JURY CHARGES FOR TEXAS CRIMINAL PRACTICE 47–48, ¶ 5 (1981) (jury charge authorizing conviction for lesser offense of voluntary manslaughter if jury found defendant acted under sudden passion or it had reasonable doubt he did)). Thus, appellant was not harmed by the omission of the voluntary manslaughter instruction. In fact, its omission had the potential to benefit him. If the jury found or had a reasonable doubt that appellant was acting under sudden passion, it was instructed to acquit appellant of murder and then consider whether he was guilty of *involuntary* manslaughter. Because that is a third-degree felony, a less serious offense than voluntary manslaughter, appellant, if acquitted of murder, would have benefitted from the omission of voluntary manslaughter. Because appellant was convicted of murder, any such benefit is entirely theoretical, but the same is true of any supposed benefit appellant could have received from an instruction on voluntary manslaughter. The law requires more. It requires "some actual rather than theoretical harm" from the error. *Arline,* 721 S.W.2d at 351.

In *Cobarrubio* and cases following it, judgments were reversed because juries were *not* required to find *as an element of murder* that the defendant was not acting under sudden passion. This jury was required to find that. Thus, the error here is not *Cobarrubio* error. *Cobarrubio* was not reversed for omitting a voluntary manslaughter instruction as a lesser included offense, separate and apart from the instruction on murder. It was reversed for not including the sudden passion element within the murder instruction. 675 S.W.2d at 752. Here, the sudden passion element was included. This explains why appellant did not suffer the harm described in *Cobarrubio.*[11] Neither is this the error that occurred in *Roberts* or *Medlock,* in which there was no mention at all of sudden passion, not as an element of murder and not as any lesser included offense. *Roberts,* 590 S.W.2d at 502. That explains why appellant did not suffer the harm found in those cases. Appellant has cited no case raising this particular claim of

---

11. The harm in *Cobarrubio* was that unless the jury was instructed to negate sudden passion *as an element of murder,* it might convict the defendant of murder, even though it believed he acted under sudden passion, without ever considering the lesser included offense of voluntary manslaughter. 675 S.W.2d at 752.

error, much less holding it was error, not to mention reversible error.

Even *Cobarrubio* error, which did not occur here and which is more harmful than what occurred here, does not require automatic reversal. In *Lawrence v. State*, 700 S.W.2d 208 (Tex.Crim.App.1985), the trial judge committed *Cobarrubio* error. Although the appellant did not object to it, the court of appeals held that it was fundamental error and reversed the judgment. *Lawrence v. State*, 699 S.W.2d 229 (Tex. App.—Austin, 1983). The Court of Criminal Appeals reversed the court of appeals' judgment and affirmed the trial court's judgment. It held the error was not egregiously harmful because in that particular case, voluntary manslaughter appeared "as an afterthought" and merely as an "incidental theory of the defense." *Lawrence*, 700 S.W.2d at 211, 213. The court concluded that "the subtle deletion of the State's burden of proof on the absence of sudden passion in the murder application paragraph cannot realistically be construed to inure to the defendant's egregious harm." *Id.* at 213.

In this case, we believe voluntary manslaughter was an incidental theory of defense. In argument at the guilt/innocence stage, appellant did not contend he should be acquitted of murder because he acted under the influence of sudden passion arising from adequate cause. He did not even mention "sudden passion." Almost all of appellant's jury argument was devoted to convincing the jury that Early was killed by "friendly fire" of another officer. Although a stronger reason to overrule this point of error is that a proper *Cobarrubio* instruction was given in the murder paragraph, we cannot believe appellant was harmed from not having sudden passion submitted twice when, although it was submitted once, he did not argue it to the jury.

We overrule point of error five.

## Admission of Evidence

■ In point of error six, appellant claims the trial court erred in admitting, over his timely objection, the affidavit (State's exhibit 117) given by a confidential informant to support the issuance of an August 1993 warrant to search the premises for cocaine. The jury charge instructed the jury to consider the evidence of any extraneous offenses solely for the purpose of determining appellant's motive, intent, and knowledge.

For several reasons, we hold that any error in admitting the affidavit was harmless and did not affect appellant's substantial rights. *See* Tex.R.App. P. 44.2(b). Appellant complains the affidavit reflected the following facts: (1) on August 9, 1993, the affiant, Officer Winkler, took an informant to the premises and he purchased cocaine from "Tommy" and (2) the informant had previously purchased a quarter kilogram bag of cocaine at the premises. Appellant does not complain in this point of error of the admission of the warrant itself, even though it contains similar information plainly indicating that this was a suspected dope house. The warrant states that the premises are to be searched for a "controlled substance"—listed as "cocaine"—and "Tommy"—a white male, 20 years old, 5'9" tall, weighing 160 pounds— was to be arrested. Although he was present when the warrant was executed, appellant was not arrested, and Officer Winkler testified that appellant was not the person ("Tommy") who made the August cocaine transaction. Moreover, the officer's return was admitted showing 14 weapons, a drug ledger book, fake cans, and $59,068.23 in cash were seized. This, along with the warrant itself, was admitted; it is not complained of in this point of error; and it is as harmful as the affidavit.

We overrule point of error six.

■ In point of error seven, appellant complains of the admission of the affidavit attached to the November 1, 1993 search warrant, State's exhibit 84.

Again, Officer Winkler was the affiant. Appellant complains of the following in the affidavit: (1) the informant returned to the premises on November 1, 1993, and again saw cocaine delivered; (2) during the August raid, a narcotics dog "hit" on several locations, over $50,000 in suspected drug money and numerous military assault weapons were seized; and (3) Winkler answered the telephone five times, and three of the callers attempted to order narcotics. Winkler testified that the description of the seller in the affidavit was "consistent" with appellant.

We hold this evidence was harmless for several reasons. Again, neither the warrant itself nor the officer's return are attacked in this point of error. The warrant mentions "cocaine" and "controlled substance" at the premises, but it does not mention appellant. The return states 15 guns and almost $290,000 were seized, along with trace amounts of marihuana and cocaine. Like the affidavit, the warrant and the return mark the premises as a drug house. Finally, we hold, in overruling points of error eight through 15 below, that the property seized in both searches was admissible at trial. That evidence of the guns, fortunes in cash, and appellant's sole control of the building is more harmful than the fact that someone who resembled appellant sold an unknown amount of cocaine on one occasion.[12]

We overrule point of error seven.

■ In points of error eight through 13, appellant claims the trial court erred in admitting evidence found during the first raid of (1) weapons found on the premises (points eight and nine), (2) weapons found in appellant's car (points ten and 11), and (3) drug ledgers found inside the premises (points 12 and 13). In points of error 14 and 15, appellant claims the trial court erred in admitting evidence of drug ledgers found outside the premises during the November raid. For each item of evidence, appellant contends that (1) it was not relevant to any issue in the case (points of error eight, ten, 12, and 14) and (2) if relevant, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, considerations of undue delay, or confusion of the issues (points of error nine, 11, 13, and 15). *See* TEX.R.CRIM. EVID. 402, 403.

■ Appellant contends the admission of this evidence constitutes impermissible evidence of extraneous offenses. *See* TEX. R.CRIM. EVID. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."). Once a defendant objects to extraneous offense evidence, the State must satisfy the trial court that the "other crime, wrong, or act" has relevance apart from its tendency to "to prove the character of a person in order to show that he acted in conformity therewith." *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim.App.1991).

Evidence of other crimes, wrongs, or acts is sometimes admissible for purposes other than proving an extraneous offense if it is "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or

---

12. As stated above, Officer Winkler testified that appellant was *not* the person, "Tommy," who made the sale described in the August 10, 1993 affidavit. Although Winkler testified at trial that the description of the unknown suspect in the November 2 warrant was "consistent" with appellant, that November description was almost identical to the August warrant's description of "Tommy." Both were described as "adult white male," "weighing approximately 160 pounds," having "a medium brown complexion," and "black hair." The only differences were one approximate inch in height, "approximately 5'09'" in the August affidavit and "approximately 5'10'" in the November affidavit, and two years of age, "approximately 20 years" in the August affidavit and "approximately 22 years" in the November affidavit. These are more like similarities than differences. Given this state of the evidence, there was little reason for the jury to believe that the seller in November was appellant and good reason for it to believe the seller was again "Tommy," an admittedly different person than appellant.

absence of mistake or accident." Tex. R.Crim. Evid. 404(b). The State contended at trial that the first raid evidence [13] was admissible to show (1) appellant's state of mind during the second raid, (2) that the police did not use "greater force than necessary to make the arrest or search," [14] (3) intent, (4) absence of mistake or accident, (5) motive, and (6) appellant's knowledge as to whether or not the raid was being conducted by the police. The State contended at trial that the second raid evidence, the drug ledgers, was admissible to show (1) motive, (2) intent, (3) absence of mistake or accident, and (4) the context in which the criminal act occurred.

We review the trial court's decision to admit this evidence under rule 404(b) under an abuse of discretion standard. *Montgomery*, 810 S.W.2d at 391. Because appellant asked for and received an instruction on self-defense, we hold that the trial court did not abuse its discretion in holding the evidence from the first raid was relevant, apart from character conformity, because it was probative of the amount of force that was necessary for the police to use during the second raid. This was a critical issue at trial under the jury charge given, which applied former Penal Code sections 9.31 and 9.32. See especially former sections 9.31(b)(2) and (c) and 9.32(3), quoted above. The jury charge repeatedly required the jury to decide whether the officers' force was reasonable. We also hold that the trial court did not abuse its discretion in holding the evidence from the second raid was relevant, apart from character conformity, because it was probative of motive for shooting Officer Early.

We overrule points of error eight, ten, 12, and 14.

We also review the trial court's decision whether to exclude this evidence under rule 403 under an abuse of discretion standard. *Montgomery*, 810 S.W.2d at 391. In deciding whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, considerations of undue delay, or confusion of the issues, the Court of Criminal Appeals has set out the following criteria: (1) whether the ultimate issue was seriously contested by the defendant; (2) whether the State had other convincing evidence to establish the ultimate issue to which the extraneous offense was relevant; (3) whether the probative value of the extraneous offense was particularly compelling; and (4) whether a jury instruction to disregard the evidence for any purpose other than that for which it was offered would be futile. *Montgomery*, 810 S.W.2d at 392–93. Applying these criteria below, we cannot conclude that the trial court acted irrationally by admitting the evidence.

As stated above, the ultimate issues—murder, sudden passion, and self-defense—were seriously contested. The State did not have other convincing evidence to overcome appellant's defenses of self-defense and to negate sudden passion, which it did by showing motive to protect drug proceeds and to escape arrest. Under these circumstances, the probative value was particularly compelling. The jury charge repeatedly required the jury to decide whether the force used by the police was reasonable or excessive, and the answer to that question was crucial, under the charge given, in determining whether appellant's use of deadly force was justified. Thus, although the danger of unfair prejudice was great, it did not "substantially outweigh" the probative value, as required by the version of rule 403 in effect at appellant's trial. Regarding the

13. (1) A "street sweeper" shotgun and a .45 caliber pistol recovered from the premises, (2) 14 guns and rifles in appellant's car, (3) drug ledgers, and (4) $59,0068.23 in cash.

14. Act of May 24, 1973, 63d Leg., R.S., ch. 399, sec. 1, § 9.31(c), 1973 Tex. Gen. Laws 883, 901 (Tex. Penal Code § 9.31(c), since amended) (self-defense to resist arrest of search).

fourth factor, the jury charge contained a limiting instruction that told the jury to consider evidence of appellant's "acts other than the offense alleged" only to determine his motive, intent, and knowledge, if any, in connection with the offense alleged. Nothing suggests the instruction was less effective in limiting the jury's consideration than the instructions generally held sufficient for that purpose in many other cases. *Accord Gardner v. State*, 730 S.W.2d 675, 696 (Tex.Crim.App.1987) (holding admission of evidence that defendant had been in penitentiary cured by instruction).

We overrule points of error nine, 11, 13, and 15.

### Conclusion

We affirm the judgment.

En banc consideration was requested.

A majority of the Court voted to consider the appeal en banc.

Chief Justice SCHNEIDER and Justices MIRABAL, WILSON, HEDGES, TAFT, and NUCHIA join the majority opinion.

Justices O'CONNOR and ANDELL dissenting.

ERIC ANDELL, Justice, dissenting.

I respectfully dissent. Although I join in the en banc majority's opinion in all respects regarding whether the trial court committed errors, I do not agree with the majority's conclusion in point of error five that the failure to instruct the jury on voluntary manslaughter was harmless. In addition, I express no opinion on point of error four regarding the factual sufficiency of the evidence on self-defense.

Because Code of Criminal Procedure article 36.19 provides for a harmless-error analysis for charge error, we do not apply Texas Rule of Appellate Procedure 44.2(b). Tex.Code Crim. P. Ann. art. 36.19 (Vernon 1981). Article 36.19 states:

Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial. All objections to the charge and to the refusal of special charges shall be made at the time of the trial.

Tex.Code Crim. P. Ann. art. 36.19 (Vernon 1981).

The Court of Criminal Appeals' major interpretations of article 36.19 are found in *Arline v. State* and *Almanza v. State*. *Arline*, 721 S.W.2d 348 (Tex.Crim.App.1986); *Almanza*, 686 S.W.2d 157 (Tex.Crim.App. 1984 & 1985). In *Almanza*, the Court of Criminal Appeals observed that if the trial court's charge error was subject to a timely objection at trial, "then reversal is required if the error is 'calculated to injure the rights of the defendant' which means no more than that there must be *some* harm to the accused from the error." *Almanza*, 686 S.W.2d at 171. Essentially, this pronouncement means that under the "some harm" analysis, "[a]n error which has been properly preserved by objection will call for reversal as long as the error is not harmless." *Id.*

In *Arline*, the Court of Criminal Appeals explained the "some harm" analysis in *Almanza*. The Court said that the defendant must have suffered " 'some' actual, rather than theoretical, harm from the error." *Arline*, 721 S.W.2d at 351. "[T]he presence of *any* harm, regardless of degree, which results from preserved charging error, is sufficient to require a reversal of the conviction. Cases involving preserved charging error will be affirmed only if *no* harm has occurred." *Id.* We determine the actual degree of harm "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the ar-

gument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza,* 686 S.W.2d at 171.

From this record, it is *obvious* appellant sustained some harm from the trial court's refusal to submit a charge on voluntary manslaughter since the jury could have convicted him on that lesser included offense. Accordingly, I would sustain point of error five and not reach point of error four.

MICHOL O'CONNOR, Justice, dissenting on appellant's motion for rehearing.

Edward John Benavides, the appellant, was convicted by a jury of the murder of Officer Early. Early died in a military–type raid of the appellant's house at 5:30 in the morning. The State charged the appellant with capital murder, arguing he knew the intruders were police. The appellant's defense was that he had no idea the intruders were officers, and given the aggressive nature of the raid, he fired once in self–defense, missing Early, who died of wounds received from other officers.

The jury acquitted him of capital murder, probably because it did not believe the appellant knew the intruders were police. Inexplicably, the jury convicted him of murder.[1] However, if the appellant did not know the intruders were officers, the appellant was entitled to defend himself from the intruders.

The appellant appealed, complaining of, among other things, the sufficiency of the evidence and the jury charge. I would sustain the points challenging the sufficiency of the evidence and the trial court's failure to instruct the jury on the lesser included offense of voluntary manslaughter, and reverse and remand for a new trial.

### Motion for Rehearing of En Banc Opinion

This case was argued before a panel consisting of Justices Cohen, Andell, and O'Connor. Justices Andell and O'Connor voted to reverse. However, no panel opinion was ever issued. The only opinion that issued in this case was issued by the en banc court, with Justices Andell and O'Connor dissenting.

The appellant filed a motion for rehearing arguing the Court improperly considered this case en banc before the panel issued its opinion. The appellant contends the proper time for submission of a case for en banc consideration, with or without a motion, is after the original panel has issued its opinion and the parties are notified of the en banc submission. If the Court had notified the appellant that the case would be considered en banc, the appellant says he would have moved to recuse two of the justices who were not members of the original panel.

The majority of the en banc court considered his point of error as a motion to recuse and denied recusal. The en banc court then overruled the motion for rehearing without addressing the issue in point of error one: may a court consider a panel case en banc without notice to the parties and before the panel issues an opinion?

Texas Rule of Appellate Procedure 47.1 requires the courts of appeals to address every issue raised and necessary to the final disposition of the appeal. *Johnson v. State,* 938 S.W.2d 65, 65 (Tex.Crim.App. 1997) (vacating court of appeals' judgment and remanding for consideration of issue raised, but not addressed); *see also Bushell v. Dean,* 803 S.W.2d 711, 712 (Tex. 1991) (reversed because court of appeals did not address all points that affected the judgment). If the Court of Criminal Appeals grants a petition for discretionary review on this issue, it will reverse and

---

1. I agree with the en banc opinion that the jury's finding on one issue is no evidence on another issue. However, it is a troubling

inconsistency in a case that has precious little evidence to support the verdict.

remand the cause back to this Court for our consideration of the appellant's point of error one; thus, prolonging an already old case.

The issue whether the full court may consider the merits of a case before a panel issues its opinion and without notice to the appellant is an important one. It is particularly important in a fact-intensive case such as this. The reporter's record in this case consists of 28 volumes; the briefs were long and complicated. Only three justices read all the briefs before oral argument, participated in a conference before oral argument, heard oral argument, and participated in a post-submission conference.

The issue is also important to the jurisprudence of the state. The clerk of the court of appeals is required to send the parties 21 days notice of, among other things, the names of the justices on the panel who will consider the case. Tex. R.App. P. 39.9(d). Rule 39.9(d) provides that the notice is "subject to change by the court." If a court can consider a panel case en banc, without notice to the parties, careful litigants must preemptively move to recuse any justice on the court who the litigant believes should be recused, even if the justice is not on the panel assigned to the case. I believe the Court should respond to the appellant's point of error one. The Court did not satisfy Rule 47.1 when it denied recusal.

### Sufficiency of the Evidence

In points of error three and four, the appellant contends the evidence is insufficient to support his conviction for murder because he acted in self-defense.

The State has the burden of persuasion in disproving evidence of self-defense. *Saxton v. State,* 804 S.W.2d 910, 913 (Tex. Crim.App.1991); *Wilkerson v. State,* 920 S.W.2d 404, 406 (Tex.App.—Houston [1st Dist.] 1996, no pet.). This is not a burden

of production, *i.e.,* one which requires the State affirmatively to produce evidence refuting the self-defense claim. Rather, it is a burden requiring the State to prove its case beyond a reasonable doubt. *Saxton,* 804 S.W.2d at 913–914; *Wilkerson,* 920 S.W.2d at 406.

The evidence relating to the elements of self-defense is as follows.

1. *Did the appellant know Officer Early was a peace officer?* The only evidence supporting the verdict in this regard is that several officers yelled "Police" and that the police had raided the compound three months earlier. Considering that fake police raided the compound in July, the officers in the November raid were heavily camouflaged, the raid took place at 5:30 a.m., was conducted a military or terroristic fashion, and the appellant had approximately three seconds[2] to respond after being awakened by flash-bang distraction devices, I would hold that no rational trier of fact could find the appellant knew Officer Early was a peace officer.

2. *Would a reasonable person in the appellant's position have retreated?* Even viewing the evidence in the light most favorable to the prosecution, there is no evidence in the record that the appellant could have retreated. He was in a bedroom and the police were blocking the only door.

3. *Did the appellant reasonably believe that the use of deadly force was immediately necessary?* As with the second element, there is no evidence supporting the jury's implied finding.

The State's entire argument under point three consists of the following:

Here, the jury had sufficient evidence so that they could reasonably conclude that the appellant did not act with reasonableness in using deadly force to defend himself or his property. When

---

**2.** Pasadena Police Officer Steven Johnson testified that approximately three seconds elapsed between when he entered the house at the beginning of the raid and when he encountered Officer Early staggering out.

viewed in the light most favorable to the prosecution, the facts show that the appellant was awake when he was confronted by Officer Early. That is, the noise of the burglar bar door being forcibly removed, the flash and band from the distraction devices, and the SWAT team members yelling "police" were certainly sufficient to awaken him had he been asleep. Moreover, the evidence concerning the August raid showed that the appellant was familiar with SWAT team tactics and distractions devices. The fact that the appellant was not shot shows that the appellant likely shot first at Officer Early. Trial testimony showed that Officer Early was an experienced officer and SWAT team member armed with a semi-automatic weapon. He would not likely have missed the appellant had he been the first aggressor.

The State's argument is that, because Early was an experienced officer, the fact that he was shot (and not the appellant) proves that the appellant knew he was shooting a police officer. That is simply not evidence. Worse, it is piling inference upon inference, something that we are not permitted to do. *Christopher v. State*, 833 S.W.2d 526, 531 (Tex.Crim.App.1992); *Richardson v. State*, 834 S.W.2d 535, 537 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). To adopt the State's argument is to assume that all police officers are more accomplished marksmen than their defendant counterparts. We cannot assume that in a shoot-out in the dark between the police and a defendant, when the officer is shot (not the appellant), the appellant must have known he was shooting a police officer. The appellant could have shot blindly in the dark and fortuitously wounded the officer.

I would hold the evidence is insufficient to support the jury's murder verdict.

### Voluntary Manslaughter

In point of error five, the appellant contends the trial court erred in refusing to instruct the jury on voluntary manslaughter.

The en banc opinion holds that the evidence was sufficient to submit the charge on voluntary manslaughter. I agree with that part of the resolution of point of error five. I disagree with the en banc court that the refusal to submit the charge helped—not harmed—the appellant. I also disagree with the en banc court's classification of the appellant's defense of voluntary manslaughter as merely "an incidental theory of defense." Voluntary manslaughter was not an incidental theory of defense. Only by classifying it as an incidental defense is the en banc court able to decide the error was harmless error; nay, even helpful error.

Because Code of Criminal Procedure article 36.19 provides for a harmless-error analysis for charge error, we do not apply Texas Rule of Appellate Procedure 44.2(b). TEX.CODE CRIM. P. art. 36.19. Article 36.19 states:

> Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial. All objections to the charge and to the refusal of special charges shall be made at the time of the trial.

TEX.CODE CRIM. P. art. 36.19.

The Court of Criminal Appeals' major interpretations of article 36.19 are found in *Arline v. State* and *Almanza v. State*. *Arline*, 721 S.W.2d 348 (Tex.Crim.App.1986); *Almanza*, 686 S.W.2d 157 (Tex.Crim.App. 1984). In *Almanza*, the Court of Criminal Appeals observed that if the trial court's charge error was subject to a timely objection at trial, "then reversal is required if the error is 'calculated to injure the rights of the defendant' which means no more than that there must be *some* harm to the accused from the error." *Almanza*, 686 S.W.2d at 171. Essentially, this pronouncement means that under the "some

harm" analysis, "[a]n error which has been properly preserved by objection will call for reversal as long as the error is not harmless." *Id.*

In *Arline,* the Court of Criminal Appeals explained the "some harm" analysis in *Almanza.* The Court said that the defendant must have suffered " 'some' actual, rather than theoretical, harm from the error." *Arline,* 721 S.W.2d at 351. "[T]he presence of *any* harm, regardless of degree, which results from preserved charging error, is sufficient to require a reversal of the conviction. Cases involving preserved charging error will be affirmed only if *no* harm has occurred." *Id.* We determine the actual degree of harm "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza,* 686 S.W.2d at 171.

From this record, I would say it is obvious the appellant sustained some harm from the trial court's refusal to submit a charge on voluntary manslaughter because the jury could have convicted him on that lesser included offense. Accordingly, I would sustain point of error five.