**Opinion issued June 25, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-18-00222-CR

_____

**ISHMAEL OMAH ALFRED, Appellant**

**V.**

**THE STATE OF TEXAS**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1472016**

---

## MEMORANDUM OPINION

A jury convicted appellant, Ishmael Omah Alfred, of murder and assessed

punishment at 20 years' confinement. On appeal, appellant contends the trial court

erred by (1) excluding the complainant's social media posts; (2) excluding evidence that the complainant had previously committed a burglary; and (3) refusing appellant's request for a jury instruction on sudden passion at the punishment phase of trial. We affirm.

## BACKGROUND

On June 9th, 2015, appellant sent the complainant, David Hernandez, a series of text messages inviting him to appellant's house. Appellant and the complainant had been friends but had not seen each other for several years because of a disagreement. The complainant arrived at appellant's around 4:30 p.m., approximately one-half hour after appellant invited him over. A neighbor saw the complainant walk to the front door, which was open, and then lost sight of him.

Several seconds later, the neighbor heard appellant shoot the complainant. Appellant then called 9-1-1 and claimed that he had detained someone trying to break into his house. Police arrived to investigate and discovered the complainant's body lying approximately five or six feet from appellant's back door. The complainant did not have any burglary tools and was unarmed.

Appellant told police that he was standing by the door when the complainant "powerwalked" by him. Appellant said he called out to the complainant, saw the complainant turn, and then appellant shot him. Appellant never stated that he saw a weapon in the complainant's hand.

2

Appellant, testifying on his own behalf at trial, gave another version of the events. Appellant testified that he was aware of some of the complainant's prior violent acts and that such acts frightened him. When the complainant appeared at appellant's house on the day of the shooting, appellant had a pistol, which was not loaded. Appellant issued an invitation for the complainant to come to appellant's house, and exchange of messages ensued in which the complainant asked appellant if he was still mad at him about clothes and admitted that he had committed a "hoe move" that he would repay. Appellant testified that he did not know what the complainant was talking about and that the complainant owed him nothing. Appellant continued to invite the complainant to come by the house. Appellant testified that he had no intention of harming the complainant.

Appellant testified that he was in the hall sending a text message to his girlfriend, when his younger brother, Jerome, alerted him to a loud noise behind the house, and his mother began yelling. Appellant noticed that a screen was off a window, which prompted him to retrieve his handgun and ammunition. Appellant saw a car he did not recognize blocking his driveway. He heard loud noises coming from the back door, but "nothing was happening" because the door was barricaded. Appellant removed the barricade and went out the back door. Outside, he saw the complainant and asked him, "What the f***, bro." The complainant turned around and, without a word, lunged and charged at appellant. The complainant's face looked

3

"angry." Appellant was frightened. The complainant was "two steps away" and raised his hands, as if to grab Appellant's gun; whereupon, appellant fired one shot that struck the complainant in the head.

Appellant testified he feared for his own safety and for that of his mother and younger brother.

## EXCLUDING COMPLAINANT'S SOCIAL-MEDIA POSTS

During cross-examination of a State's witness, appellant sought to introduce 15 posts from the complainant's Facebook page, made several years before the charged offense, in which the complainant proclaimed himself to be violent, or a "thug" or showed pictures of himself engaged in criminal or obscene activity. In issue one, appellant contends the trial court abused its discretion in refusing to admit the complainant's social media posts.

### *Standard of Review*

We review a trial court's rulings to admit or exclude evidence under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). We will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *See id.* We uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *See Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

4

*Self-defense—Character Evidence under Rule 404(a)(3)*

In general, evidence of a person's character may not be used to prove that the person "behaved in a particular way at a given time." *Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998); *see* TEX. R. EVID. 404(a). This limit on character evidence, however, is not absolute. When a defendant in a homicide prosecution raises the issue of self-defense, he may introduce evidence of the victim's violent character on two separate theories. TEX. R. EVID. 404(a)(3); *see Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009); *Torres v. State*, 117 S.W.3d 891, 894 (Tex. Crim. App. 2003).

Under the first theory, the defendant may offer reputation or opinion testimony, or evidence of specific prior acts of violence by the victim, to show the reasonableness of the defendant's claimed fear of danger from the victim. *See Miller*, 330 S.W.3d at 618. This is called "communicated character" evidence because the defendant knows of the victim's violent tendencies and sees a danger posed by the victim, regardless of whether that danger is real. *See id*. The defendant is not trying to prove the victim was actually violent, but that his fear of the victim during their confrontation was reasonable. *See id*. at 619.

Under the second theory—called "uncommunicated character" evidence because it does not matter whether the defendant knew of the victim's violent character—a defendant may offer evidence of the victim's character trait for

5

violence to show that the victim was, in fact, the first aggressor. *See id*.; *see also* TEX. R. EVID. 404(a)(2). "The chain of logic is as follows: a witness testifies that the victim made an aggressive move against the defendant; another witness then testifies about the victim's character for violence, but he may do so only through reputation and opinion testimony under Rule 405(a)." *Miller*, 330 S.W.3d at 619.

In this case, appellant offered the complainant's Facebook posts (1) "[t]o correct the impression of good character of the [c]omplainant previously testified to by Dezerai Rodriguez, on direct examination from the State;" (2) to show an "uncommunicated character" trait of the complainant, i.e., that complainant was the first aggressor; and (3) under the rule of optional completeness. We address each argument respectively.

### *To Correct a False Impression*

At trial, the State called Dezerai Rodriguez, the complainant's previous girlfriend. Rodriguez testified that the complainant was "very outgoing," "the life of the party," and "just real fun to be around." She also testified that the complainant never hurt her and that his tattoos did not scare her. Appellant argues that the Facebook posts should have been admitted to counter Rodriguez's testimony, which "create[d] an image of the Complainant as friendly and harmless."

The general rule is that a party is not entitled to impeach a witness on a collateral matter. *Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990).

6

However, when a witness has voluntarily testified to a collateral matter resulting in a false impression, the witness may be impeached on that matter in order to correct the false impression. But, courts construe this exception narrowly. *James v. State*, 102 S.W.3d 162, 181 (Tex. App.—Fort Worth 2003, pet ref'd). Moreover, "[u]nless the witness's testimony created a false impression that is directly relevant to the offense charged, allowing a party to delve into the issue beyond the limits of cross examination wastes time and confuses the issues." *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009).

Even if we were to agree that Rodriguez's testimony left a false impression that the complainant was "friendly and harmless," appellant had the opportunity to correct the alleged false impression by cross-examining Rodriguez at trial. Appellant was not entitled to correct the alleged false impression by introducing extrinsic evidence via the complainant's Facebook posts. *See Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002) ("[O]pponent must correct the 'false impression' through cross-examination of the witness who left the false impression, not by calling other witnesses to correct that false impression").

*First aggressor—Texas Rule of Evidence 404(a)(3).*

Appellant also argues that, under Rule 404(a)(3), he was entitled to introduce the complainant's Facebook posts to show that the complainant had an uncommunicated character trait for aggression. It is true that a defendant may offer

7

uncommunicated evidence of the victim's character trait for violence pursuant to Rule 404(a) to show that the victim was the first aggressor, but a defendant may do so "only through reputation and opinion testimony under Rule 405(a)." *Ex parte Miller*, 330 S.W.3d at 619; *Allen v. State*, 473 S.W.3d 426, 445 (Tex. App.— Houston [14th Dist.] 2015, pet. dism'd); *see* TEX. R. EVID. 405(a).

Here, appellant proffered evidence, i.e., the complainant's Facebook posts, to show that appellant represented himself as a violent "thug." Such evidence, appellant contends, shows that the complainant's character trait for violence and demonstrates that he was the first aggressor. Although the Facebook posts were an attempt to show the complainant's conformity with his violent character, they were neither reputation nor opinion testimony. *See Allen*, 473 S.W.3d at 445–46. As such, the trial court did not abuse its discretion in excluding the proffered evidence. *See Ex parte Miller*, 330 S.W.3d at 620; *Allen*, 473 S.W.3d at 445–46.

*Optional Completeness*

Appellant also complains that, because the State entered his own text messages into evidence, which were sent to the complainant via the Facebook Messenger application less than an hour before the murder, he should, under the rule of optional completeness, be able to introduce all of the complainant's Facebook posts, which were from several years before the murder.

Texas Rule of Evidence 107, the rule of optional completeness, is an exception to the general rule that hearsay is inadmissible. *Pena v. State*, 353 S.W.3d 797, 814 (Tex. Crim. App. 2011); *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). The rule of optional completeness provides:

> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent. "Writing or recorded statement" includes a deposition.

TEX. R. EVID. 107.

This rule "is one of admissibility and permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party." *Walters*, 247 S.W.3d at 217–18. The rule "is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing." *Id.* at 218.

Admission of evidence under the rule of optional completeness is "not invoked by the mere reference to a document, statement, or act." *Pena*, 353 S.W.3d at 814; *Walters*, 247 S.W.3d at 218. Rather, for evidence to be admissible under this rule, "the omitted portion of the statement must be 'on the same subject' and must be 'necessary to make it fully understood.'" *Pena*, 353 S.W.3d at 814 (quoting *Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004)); *see Walters*, 247

9

S.W.3d at 218 ("Rule 107 does not permit the introduction of other similar, but inadmissible, evidence unless it is necessary to explain properly admitted evidence.").

We begin our analysis by noting that the Facebook posts from previous years and the text messages sent via the Facebook Messenger application are not a part of the same "act, declaration, conversation, writing, or recorded statement," as required by Rule 107. The text messages are part of a recent private conversation between appellant and the complainant and were sent on a completely separate application.[1] In contrast, the Facebook posts are not private conversations between appellant and the complainant, but were visible to all of the complainant's "friends" on Facebook, which is a separate platform from Facebook Messenger. As such, the rule of optional completeness is not applicable.

And, even if it were, the trial court would not have abused its discretion in refusing to admit the Facebook posts under the rule of optional completeness because they are not "on the same subject," nor are they "necessary to make [the text messages] fully understood." Appellant claims that one of the Facebook posts explains one of the text messages about why appellant was mad at the complainant,

---

[1]     Appellant's own expert explained that Facebook Messenger messages cannot be viewed on Facebook and that a separate application is used to send these messages.

10

however, he does not elaborate about which post he is referencing or why that would justify the admission of all 15 Facebook posts.

Because the trial court did not abuse its discretion by refusing to admit the complainant's Facebook posts under any of the theories set forth by appellant, we overrule issue one.

## EXCLUDING EVIDENCE OF COMPLAINANT'S PRIOR BURGLARY

In issues two and three, appellant contends the trial court erred by refusing to allow him to (1) question a defense witness about details of a previous burglary committed by the complainant and (2) introduce DNA evidence tying the complainant to that previous burglary. Specifically, appellant sought to question a defense witness, William Eason, a prison inmate, about burglaries he had seen the complainant commit in the past. And, appellant also sought to admit evidence that the complainant's DNA was found at the scene of an unrelated 2013 burglary.

### *Crimes, Wrongs, and Other Acts under Rule 404(b)*

In addition to the character evidence permitted by Rule 404(a)(3), as discussed above, a separate rationale may support the admission of evidence under Rule 404(b) of a "victim's prior specific acts of violence when offered for a non-character purpose—such as his specific intent, motive for an attack on the defendant, or hostility—in the particular case." *Ex parte Miller*, 330 S.W.3d at 620; *see* TEX. R. EVID. 404(b). "The proper predicate for the specific violent prior act by the deceased

11

is some act of aggression that tends to raise the issue of self-defense, which the violent act may then help clarify." *Torres*, 117 S.W.3d at 895. Under Rule 404(b), a victim's prior acts of violence may be admissible to clarify the issue of first aggressor if the proffered act explains the victim's ambiguously aggressive conduct. *Allen v. State*, 473 S.W.3d 426, 446 (Tex. App.—Houston [14th Dist.] 2015, pet. dism'd). "As long as the proffered violent acts explain the outward aggressive conduct of the deceased at the time of the killing, and in a manner *other than demonstrating character conformity only*, prior specific acts of violence may be admitted even though those acts were not directed against the defendant." *Torres v. State*, 71 S.W.3d 758, 762 (Tex. Crim. App. 2002) (emphasis added).

Here, the proffered acts—prior, unrelated burglaries—were offered for the purpose of demonstrating character conformity only, i.e., that because the complainant had committed burglaries before, he must have been committing a burglary when he was shot. As such, the trial court did not abuse its discretion in refusing to admit the details and DNA evidence from another, unrelated burglary committed by the complainant.

Furthermore, appellant was permitted to question Eason about burglaries that Eason had seen appellant commit, he was just prohibited from eliciting details about how the burglaries were accomplished or how much time they took, or from introducing DNA evidence to connect the complainant to a specific, unrelated

12

burglary. Because appellant was not prevented from proving that the complainant was a burglar and essentially the same or similar evidence to that excluded was, in fact, admitted, error, if any, was rendered harmless. *See Montgomery v. State*, 383 S.W.3d 722, 727 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Although the trial court may have initially excluded this evidence, the later admission renders harmless any possible error.").

We overrule issues two and three.

## REFUSING JURY INSTRUCTION ON SUDDEN PASSION

In issue four, appellant contends the trial court erred in refusing to give a charge on sudden passion at the punishment stage of trial. Specifically, appellant argues that given his "prior relationship [with the complainant] and all he knew about the complainant, it was reasonable that he should fear [the] complainant, even as an invitee, if [the] complainant arrived, went to the back door without announcing his presence, and began beating or kicking on it."

### *Standard of Review*

The review of an alleged jury charge error in a criminal trial is a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). First, an appellate court must determine whether there was error in the jury charge. *Id.* Then, if there is charge error, the court must determine whether there is sufficient harm to require reversal. *Id.* at 731–32. The standard for determining whether there is

13

sufficient harm to require reversal depends on whether the appellant objected to the error at trial. *Id.* at 732.

If the appellant objected to the error, the appellate court must reverse the trial court's judgment if the error "is calculated to injure the rights of the defendant." TEX. CODE CRIM. PROC. ANN. art. 36.19. This means no more than that there must be some harm to the accused from the error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). An appellant who did not raise the error at trial can prevail only if the error is so egregious and created such harm that he has not had a fair and impartial trial. *Id.* "In both situations the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*

The record must show that the defendant suffered actual harm, not merely theoretical harm. *Id.* at 174. In assessing whether the trial court erred by denying a requested defensive instruction, an appellate court must examine the evidence offered in support of the defensive issue in the light most favorable to the defense. *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013). The charge must include an instruction on any defensive theory raised by the evidence and properly requested by the defendant. *Booth v. State*, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984).

*Applicable Law on Sudden Passion*

Sudden passion is a mitigating circumstance that, if proven by a preponderance of the evidence, reduces murder from a first-degree felony, which carries a maximum punishment of life imprisonment, to a second-degree felony, which carries a maximum punishment of twenty years' imprisonment. *See* TEX. PENAL CODE §§ 12.32, 12.33, 19.02(d); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). The Penal Code defines "sudden passion" as "passion directly caused by and arising out of provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). "Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

Rarely, when self-defense is raised will sudden passion not be raised. *See Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App.—San Antonio 1999, pet. ref'd). Conversely, "when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion." *Id.* (quoting *Benavides v. State*, 992 S.W.2d 511, 524–25) (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd)).

***"Some Harm" Not Shown***

We need not decide whether the trial court erred in denying the sudden-passion charge because appellant cannot show that he suffered "some harm" as a result of the trial court's refusal to charge the jury on sudden passion.

The Court of Criminal Appeals has addressed the issue of how a jury's rejection of self-defense affects the harm analysis with respect to the erroneous denial of a sudden-passion instruction. *See Wooten v. State*, 400 S.W.3d 601, 608 (Tex. Crim. App. 2013); *Trevino v. State*, 100 S.W.3d 232, 241 (Tex. Crim. App. 2003).

In *Trevino*, the defendant was charged with the murder of his wife. 100 S.W.3d at 232, 236. He claimed that the shooting occurred after a heated argument and struggle over two guns. *Id.* at 233. According to police, the defendant told them that his wife confronted him with a gun after finding telephone numbers of other women in his wallet. *Id.* The defendant then retrieved his own gun, and, after his wife shot at him but missed, the two struggled over the guns. *Id.* In the course of the struggle, the defendant's wife was shot three times. *Id.*

A police officer testified that the crime scene did not match the defendant's story. *Id.* Based on this testimony, the State argued the defendant shot his wife and then staged the scene to make it look like self-defense. *Id.* at 232, 235–36. The jury rejected appellant's claim that the shooting was an accident and that he acted in self-

16

defense and, after the trial court refused to instruct the jury on sudden passion, assessed a sixty-year sentence. *Id.* at 236.

The court of appeals reversed, finding that the trial court should have instructed the jury on sudden passion, and that appellant was harmed. *Id.* Agreeing with the court of appeals that appellant was harmed, the court of criminal appeals noted that the jury could have found that appellant killed his wife in sudden passion and then staged the crime scene to make the killing appear to have occurred in self-defense. *Id.* at 241–43.

In *Wooten*, appellant was charged with murder after the victim was killed in a gunfight. 400 S.W.3d at 602–03. According to the defendant, who testified at trial, the victim dropped off the defendant's girlfriend, a prostitute, at defendant's apartment after "backing out" of a "date" with her. *Id.* at 603. The defendant greeted his girlfriend outside the apartment and approached the victim's car. *Id.* The defendant noted the victim had placed a gun on the console, but began talking with him. *Id.* When the conversation turned to why the "date" had not occurred, the victim's demeanor "became more combative." *Id.* The defendant testified that the victim was frustrated and began to speak in a "heightened tone" and display a "sort of 'aggressiveness' in his speaking." *Id.* When the defendant told the victim he should pay his girlfriend "something for her time," the victim lashed out verbally

and then shot at the defendant. *Id.* The defendant shot back in claimed self-defense, killing the victim. *Id.*

The jury was instructed on self-defense, but was told "not to consider whether appellant failed to retreat." *Id.* at 603–04, 609. The jury rejected the defendant's self-defense claim, and, as in *Trevino*, when the trial court refused to instruct on sudden passion, assessed a sixty-year sentence. *Id.* at 603–04. The court of appeals, concluding that the failure to instruct on sudden passion harmed the defendant, reversed as to punishment. *Id.* at 604.

Disagreeing that appellant was harmed, the court of criminal appeals observed that "the success of appellant's self-defense claim boiled down to whether the jury would accept that, when he shot [the victim], he reasonably believed that deadly force was necessary to protect himself from [the victim's] use of deadly force." *Id.* at 607, 609. Noting deadly force was the only element of self-defense refuted by the evidence, the court concluded the jury rejected the inference that the victim shot first because, had they believed appellant's testimony that the victim shot first, the jury "almost certainly" would have acquitted appellant. *Id.* The court further concluded that, the jury, having rejected appellant's self-defense claim, "was highly unlikely" to find appellant acted under sudden passion. *Id.* The court of criminal appeals concluded that the defendant had failed to show "some harm," stating:

> It is highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately

18

necessary to defend himself would nevertheless find in his favor on the issue of sudden passion. To prove sudden passion, the appellant would have had to establish, inter alia, 1) that he actually acted under the influence of a fear so great that it caused him to lose his capacity for cool reflection, and 2) that [the complainant's] actions were adequate to produce such a degree of fear in a man of ordinary temperament. But a jury that had already discredited the appellant's claim that he reasonably believed deadly force to be immediately necessary would be unlikely to believe that, at the time the appellant first fired, he was actually experiencing a level of fear that caused him to lose control. Moreover, even had the jury believed that the appellant subjectively experienced such a level of fear, it would not likely have found that [the complainant's] behavior presented a provocation adequate to produce such a degree of fear in a man of ordinary temperament. Based on the record and evidence before us, it is exceedingly unlikely that the appellant suffered "some harm" as a result of the trial court's failure to give the jury a sudden passion instruction based on the appellant's assertion that terror or fear controlled his actions.

*Id.* at 609–10.

This case is like *Wooten*, not *Trevino*. In *Trevino*, there was another basis for the jury's rejection of appellant's self-defense claim, i.e., that the murder scene was staged to look like self-defense. No such basis is present here. As in *Wooten*, appellant's self-defense case in this case "boiled down to whether the jury would accept that, when he shot [the complainant], he reasonably believed that deadly force was immediately necessary to protect himself from [the complainant's] use of deadly force. *Id.* at 609. And, as in *Wooten*, the jury was specifically admonished "not to consider whether the defendant failed to retreat." *Id.* at 610. As in *Wooten*, the jury, having already rejected appellant's self-defense claim, was "exceedingly unlikely"

to have suffered "some harm" as a result of the denial of the "sudden passion" charge at punishment.

Accordingly, we overrule issue four.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).