

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00073-CR

PATRICK EARL O'NEAL, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 29382

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

# MEMORANDUM OPINION

Patrick Earl O'Neal, Jr., was convicted of murdering Antwaine Massey in Lamar County during a gunfight with another person. O'Neal appeals, urging that the jury should have been instructed on self-defense and on the lesser-included offense of manslaughter. After hearing oral argument and reviewing the applicable law, we find (1) that the evidence does not support a jury instruction on self-defense and (2) that O'Neal waived his request for a charge instruction on the lesser-included offense of manslaughter.

We affirm the trial court's judgment.

## I. Summary of the Testimony

### A. Events Before the Shooting

A little after dark on April 2, 2021, O'Neal shot Massey and James Burton in front of O'Neal's house. Both men were shot from behind. Burton survived, but Massey died at the scene.

While O'Neal was inside his fenced front yard, he argued with Burton, a neighbor, who had just driven up in Burton's side-by-side, all-terrain vehicle. Massey was in the passenger side of the side-by-side and did not participate in the argument. All witnesses agreed that Massey simply sat in the side-by-side until the shooting started.

The police had been to O'Neal's house earlier that day. O'Neal's wife, Jennifer, had a daughter, Madeleine, who was married to Cameron McDowell, and the McDowells had four children. The day of the shooting, O'Neal and Jennifer argued and fought throughout the day

while babysitting their grandchildren.[1]  During the O'Neals's argument, Jennifer's phone dialed Madeline.  When Jennifer realized Madeline was on the line, she had the grandchildren go outside, and she told Madeline to call Cameron's mother, Shabecka, to come get the children. After retrieving the children, Shabecka called the Paris Police Department to report the fighting at the O'Neal house.  The police arrived around 6:00 or 7:00 p.m. but made no arrests.

As recounted by O'Neal, Cameron was very angry that Cameron's children had been exposed to such domestic drama, and he and O'Neal engaged in heated phone conversations and text communications throughout the afternoon.  O'Neal said in his interview with detectives that Cameron made threats to him and invited him to fight.

Burton was Cameron's stepfather, and Massey was Cameron's half-brother.  In his testimony, Burton denied any awareness of Cameron's exchanges with O'Neal.

According to Burton, that evening he went out for a customary drive in his side-by-side to the lake, a drive that took him past O'Neal's house.[2]  Burton also testified that, as customary, Massey rode with him that evening and Burton carried a pistol and an extra magazine on account of feral hogs by the lake.  It was getting dark, so Burton and Massey left the lake and began to return home.  This took them back past the O'Neal house.

---

[1]At the punishment phase of trial, Jennifer testified that the arguing led to O'Neal firing a shotgun near her leg, causing burns.  Later, with the children in the hallway watching, O'Neal got Jennifer on the bathroom floor, punching her in the face.  Photos of her black eyes were admitted into evidence, and she needed reconstructive surgery for her eye socket.

[2]Burton and Shabecka lived "down the road and around the corner" from the O'Neals.

## B.     Burton's Testimony

Burton testified that, as he and Massey headed back to Burton's home, O'Neal flagged them down. Burton got off the side-by-side to speak to O'Neal. O'Neal "started in . . . about Cameron" and "was really mad." O'Neal threatened to kill Cameron and Madeline and said that "Cameron's bridges [were] burned." As O'Neal continued to deride Cameron to Burton, O'Neal looked to Massey, who was still sitting in the side-by-side, "like he was trying to get a response out of" Massey, but Massey "never said a word." Massey just sat there. Burton described O'Neal as "real agitated," and Burton was "kind of worried" and "felt like [they] pulled up to a trap." Burton "could just tell by the way [O'Neal] was acting that he was dangerous." O'Neal "was talking about killing people and he reached behind him," which led Burton to think O'Neal was about to shoot Burton and Massey. Burton pulled his own gun and hit O'Neal in the face with it.[3] Burton admitted he pulled a gun first to hit O'Neal but said O'Neal shot first. He said O'Neal "ran backwards and got a gun and shot [them]." Burton said he then fired three shots toward O'Neal. Burton also testified that Massey, though he had a pistol in his pocket, never pulled it out.[4]

## C.     Jennifer O'Neal's Testimony

O'Neal's wife, Jennifer, testified that O'Neal remained "agitated" throughout the afternoon and evening, including during O'Neal's communications with Cameron and after the police responded to Shabecka's call. Sometime after 7:00 p.m., Jennifer heard Burton's side-by-

---

[3]Burton testified that he knew O'Neal carried a gun.

[4]Massey's gun was still in his pocket at the hospital.

4

side go by the O'Neal home. She heard the side-by-side go by again about ten or fifteen minutes later.[5] She "heard [O'Neal] holler," and the side-by-side stopped.

Jennifer, who was inside the house, saw O'Neal walk across the yard toward the fence and heard Burton's voice. From the window, she saw a second person on the side-by-side, whom she did not know, "just looking forward." According to Jennifer, that person "didn't even pay [Burton and O'Neal] no mind." At some point, she heard Burton and O'Neal raise their voices and heard Burton threaten to shoot O'Neal. After "a few seconds," Jennifer heard three shots. She then saw O'Neal return fire. O'Neal then ran in to the house, and Jennifer heard no more gunfire.

### D.    O'Neal's Testimony

O'Neal testified that when Burton stopped by O'Neal's mailbox, he thought Burton wanted to talk. Referring to his earlier text argument with Cameron, O'Neal asked Burton what "Cameron's problem" was. According to O'Neal, Burton got out of the side-by-side with a pistol drawn. According to O'Neal, Burton pointed his gun at O'Neal, approached him, put the gun to O'Neal's head, and threatened to kill him. O'Neal said Burton then struck O'Neal in the face with his gun.[6] According to O'Neal, after that, Burton said—apparently to Massey—"[D]id you see that?"

O'Neal said he ran for his front door and heard two shots. He reached to the front of his waistband for his own pistol and "started shooting back just so [he] could get in [his] house."

---

[5]Jennifer testified that she was familiar with the sound of the side-by-side because Burton or Shabecka frequently drove past the O'Neal home with the grandchildren.

[6]A photo of O'Neal with a cut to his face was admitted into evidence, and the cut can be seen in O'Neal's recorded interview with detectives after the shooting.

5

O'Neal testified, "I just wanted the man to stop shooting at me. I never meant to shoot anyone." O'Neal claimed that he feared for his life and that of his wife, who was in the house. O'Neal said, "I couldn't even see where I was shooting. I mean it was dark in the area where I was shooting. I was shooting towards the threat . . . . I just wanted him to stop shooting at me." Once in the house, O'Neal told his wife, "I think I might've shot somebody."

O'Neal testified that he knew he "had done something wrong" and felt bad for not calling 9-1-1.[7] He did not know Massey, and at the end of his interview with law enforcement, they told him Massey was dead. When his attorney asked O'Neal if he intended "to murder anybody that night," O'Neal answered, "No, sir." Rather, O'Neal explained that he "just wanted people to quit shooting at [him]." He continued, "I didn't know if one people [sic] or two people were shooting. I just knew I was being shot at."[8]

On cross-examination by the State, O'Neal said he saw no threat from Massey, was only defending himself from Burton, and agreed that, since Burton was shot in the back of the neck, he was not a threat. O'Neal never saw Massey make any move toward him or draw a weapon. O'Neal testified that he was only defending himself from Burton and perceived no threat from the person later shown to be Massey.[9]

---

[7]After the shooting, when O'Neal did not hear the side-by-side leave, he called his mother.

[8]It is this statement—"I didn't know if one people [sic] or two people were shooting"—that is the basis for his claim that the evidence raised the issue of self-defense.

[9]Detective David Whitaker was present during O'Neal's interview with another detective the night of the shooting. Whitaker testified that at no time did O'Neal say anything about Massey threatening or assaulting O'Neal or that O'Neal had any fear of Massey. In the interview, O'Neal never said he knew Massey had a pistol and never said Massey pointed a gun at him.

## II.     Standard of Review

O'Neal argues that the trial court erred by omitting jury instructions. We review such claims "under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)." *Graves v. State*, 452 S.W.3d 907, 910 (Tex. App.—Texarkana 2014, pet. ref'd). "We first determine whether error exists." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). "If there is no error, our analysis ends." *Id.* (citing *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012)).

"Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Id.* (citing *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007)). "We view the evidence in the light most favorable to the defendant's requested defensive instruction." *Id.* (citing *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017)).

> [W]e do not apply the usual rule of appellate deference to trial court rulings when reviewing a trial court's decision to deny a requested defensive instruction (whether for the submission of a defense or for a lesser-included offense). Quite the reverse, we view the evidence in the light most favorable to the defendant's requested submission.

*Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). "A trial court errs to refuse a self-defense instruction if there is some evidence, viewed in the light most favorable to the defendant, that will support its elements." *Jordan*, 593 S.W.3d at 343. "[I]f the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not

7

entitled to an instruction on the issue." *Gaspar v. State*, 327 S.W.3d 349, 356 (Tex. App.—Texarkana 2010, no pet.) (quoting *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001)).

## III. First Point of Error: Self-Defense

In his first point of error, O'Neal argues that the trial court should have included a self-defense instruction in the jury charge.

### A. The Law on Self-Defense

In general, a defendant is entitled to a jury instruction on a defensive issue if the defensive issue "is raised by the evidence, regardless of the strength or credibility of that evidence." *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013). "The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge." *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984). "Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law." *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007).

"In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Id.* "[W]hen the defensive evidence merely negates the necessary culpable mental state, it will not suffice to entitle the defendant to a defensive instruction." *Id.* "Rather, a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense . . . but interposes the justification to excuse the otherwise criminal conduct." *Id.*; *see also Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010) (explaining that doctrine of confession and avoidance "requires

8

an admission to the conduct, which includes both the act or omission and the requisite mental state"). However, "[a]dmitting to the conduct does not necessarily mean admitting to every element of the offense." *Gamino*, 537 S.W.3d at 512. "For example, a defendant" can essentially admit to the commission of murder but still deny "an intent to kill." *Id.*

The Texas Penal Code allows the use of deadly force in self-defense under particular circumstances:

> (a)    A person is justified in using deadly force against another:
>
>> (1)    if the actor would be justified in using force against the other under Section 9.31; and
>>
>> (2)    when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>>
>>> (A)    to protect the actor against the other's use or attempted use of unlawful deadly force . . . .

TEX. PENAL CODE ANN. § 9.32(a).

"Deadly force is 'force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.'" *Rodriguez v. State*, 629 S.W.3d 229, 236 (Tex. Crim. App. 2021) (quoting TEX. PENAL CODE ANN. § 9.01(3)). "In the context of self-defense, actual deadly force is not required; rather, apparent danger may suffice." *Id.* (citing *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020)).

**B.    Subjective and Objective Components**

Section 9.32's "'reasonably believes' language contains subjective and objective components." *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). "A defendant must subjectively believe that another person used or attempted to use . . . deadly force (Section 9.32)

9

against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary." *Id.* (citing *Semaire v. State*, 612 S.W.2d 528, 530 (Tex. Crim. App. [Panel Op.] 1980)). "Second, a defendant's subjective belief must be reasonable." *Id.* "A reasonable belief is one held by an 'ordinary and prudent man in the same circumstances as the actor.'" *Id.* (citing Tex. Penal Code Ann. § 1.07(a)(42)). Therefore, while "[t]he reasonableness of [the] defendant's belief . . . is *viewed* from the defendant's standpoint at the time he acted[,]" *Benavides v. State*, 992 S.W.2d 511, 521 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (emphasis added), it is "*measured* by the objective standard of an 'ordinary and prudent man[,]'" *Echavarria v. State*, 362 S.W.3d 148, 154 (Tex. App.—San Antonio 2011, pet. ref'd) (emphasis added).

"In certain situations, an actor's subjective belief is presumed reasonable," including in circumstances where the victim "unlawfully and with force enter[s]" the actor's habitation. *Lozano*, 636 S.W.3d at 32 (quoting Tex. Penal Code Ann. § 9.32(b)). Yet, "[b]y its own terms, the presumption applies under Section 9.32(b) *only if* the defendant *first* harbors a *subjective belief* that the use of deadly force was *immediately necessary* to *defend himself from another's use or attempted use of deadly force*." *Id.* at 33 (emphasis added).

### C. Analysis

O'Neal's self-defense argument turns on whether Massey presented a threat to O'Neal. Crucially, though, O'Neal admitted on cross-examination that he only perceived a threat from Burton. O'Neal did not perceive a threat from Massey as indicated by the following testimony:

> Q. . . . . So, whatever need you thought you had to defend yourself was all regarding Mr. Burton, right?

10

A.      Yes, sir.

Q.      Okay. Not regarding Mr. Massey?

A.      Correct.

Stated more precisely, O'Neal's self-defense argument turns on whether a threat from Massey arose from the circumstances, even though O'Neal did not observe any threat from Massey and even though O'Neal made the above-quoted concession on cross-examination.

O'Neal testified that he wanted "people" to stop shooting at him, though he immediately qualified this by saying that he "didn't know if one people [sic] or two people were shooting" at him. O'Neal admitted, however, that he could not see Massey and, therefore, did not know that it was Massey until after the fact.[10] O'Neal admitted that he did not see Massey draw a weapon or make any threatening move. Nonetheless, O'Neal disavowed firing any warning shots; he was firing at the side-by-side and, more particularly, at what O'Neal said was the threat, i.e., the

---

[10]The testimony on this point was as follows:

Q.      . . . . During that [custodial] interview, you told [the interviewing officer] that Mr. Massey had just been sitting on the ATV the whole time, right?

A.      As far as I know. I really don't know because I couldn't see him.

. . . .

Q.      . . . . You never saw him draw a weapon? Never saw him make a move towards you?

A.      No, sir.

Q.      . . . . [You] did not see him make any sort of threat towards you did you?

A.      No, sir, I couldn't see him.

11

"people" shooting at him.[11] In all, O'Neal fired six rounds to Burton's three. Massey fired no rounds.[12] Though he fired six rounds, O'Neal testified that he could not see where he was shooting.[13]

O'Neal further conceded on cross-examination that the entrance wounds on Massey's back and to the back of Burton's neck were consistent with Burton's testimony that Massey was shot as he had his back turned to O'Neal and was attempting to "get out and get away," and that Burton also had his back to O'Neal as Burton then attempted to lift the stricken Massey and pull him into the side-by-side. In O'Neal's words, the sequence of events as Burton described them "would make sense."

Given O'Neal's "people" testimony, the initial threat from Burton need not be parsed moment-by-moment, word-by-word, shot-by-shot, between Burton and O'Neal.[14] At trial and in

_____

[11]The testimony on this point was as follows:

> Q.      So if they're [the rounds fired by O'Neal] all kind of focused on the side-by-side that's not just a random pattern of warning shots, is it?
>
> A.      *I didn't have time to stop and fire a warning shot.*
>
> Q.      Okay. And in fact, all of those shots were directed at and in the direction of the side-by-side, right?
>
> A.      They were *directed in the direction of my threat*, sir.

(Emphasis added).

[12]Officers found a .22 in Massey's pocket, but there was no round in the chamber, and no spent .22 rounds were found at the scene.

[13]"I couldn't even see where I was shooting. I mean it was dark in the area where I was shooting. I was shooting towards the threat, you know."

[14]*See Witty v. State*, 203 S.W.2d 212, 218 (Tex. 1947) ("Self-defense implies defensive and not offensive acts. When the acts of an accused cease to be defensive and take on the offensive, then he becomes the aggressor and is

12

the briefing, there was some discussion of Section 9.05 of the Texas Penal Code. O'Neal's theory of self-defense in this case, though, is that *Massey himself* was a threat, i.e., not an "innocent third person" for purposes of Section 9.05. Further, even if Massey could be considered an "innocent third person" as to any self-defense by O'Neal in response to a threat from Burton, O'Neal was shooting at both Burton and Massey. O'Neal's fire was not meant for Burton and only Burton.

Massey cannot simultaneously be an assailant acting alone or in combination with Burton—the focus of the defense trial presentation—and an innocent bystander. Section 9.05 of the Texas Penal Code states that, "[e]ven though an actor is justified . . . in threatening or using force or deadly force against another, if in doing so he also recklessly injures or kills an innocent third person, the justification [of self-defense] is unavailable in a prosecution for the reckless injury or killing of the innocent third person." TEX. PENAL CODE ANN. § 9.05. Burton would be "another" in this scenario, and Massey would be "the innocent person." However, O'Neal fired six rounds in Massey's general direction and testified that he could not see where he was shooting. On appeal, O'Neal concedes that there is no evidence that he took any steps to protect Massey from that fire. The Texas Penal Code defines reckless as follows:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care

---

no longer acting in self-defense."); *see also Lozano*, 636 S.W.3d at 34 (noting that defendant "might have shot [victim] once in self-defense, then continued shooting even though he knew [victim] was no longer a threat").

13

that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c).

In other words, in a scenario where Massey is the claimed threat, "innocent bystander" does not act as a separate self-defense theory for O'Neal, nor does it bolster his self-defense theory. Instead, under a scenario where Burton is the threat, § 9.05 is a mechanism by which O'Neal may be prohibited from asserting self-defense. On appeal, O'Neal concedes that there is no evidence that he took any steps to protect Massey from any of O'Neal's six rounds.

In the trial court, O'Neal couched his request for a self-defense jury instruction in terms that could be construed to invoke the "multiple assailant" theory of self-defense: "Our theory is that he's acting together with the other man when he came over to confront Mr. O'Neal." Elsewhere though, O'Neal asked that "the issue of innocent bystander" be put to the jury, as well as "self-defense."

While the "multiple assailants" category "does not require evidence that each person defended against was an aggressor in his own right," it does require "evidence that the defendant had a reasonable fear of serious bodily injury from a group of people *acting together*." *Jordan v. State*, 593 S.W.3d 340, 344 (Tex. Crim. App. 2020) (emphasis added). More specifically, the group must have been acting together *in the aggression*. *Id.* at 343 ("The issue may be raised even as to those who are not themselves aggressors as long as they seem to be in any way encouraging, aiding, or advising the aggressor.").

In *Dickey v. State*, 22 S.W.3d 490 (Tex. Crim. App. 1999), Dickey and another man, Brown, went to the home of a third man, Marvis, to collect a debt Marvis allegedly owed Brown.

14

*Id.* at 491. The men argued, and Dickey testified that Brown and Marvis "started looking at each other" at which point Dickey "felt they were about to turn on" him. *Id.* "[T]here [was] absolutely nothing in the actions of either Marvis or Brown which would indicate their collusion." *Id.* at 492. Where "the only defensive evidence was Dickey's statement, there [was] no explanation as to why Dickey would think the other two men were teaming up on him." *Id.*[15] Similar to the situation in *Dickey*, O'Neal's testimony that he did not know if he was being shot at by one or two people, where the rest of the evidence conclusively shows Massey took no offensive act and presented no threat to O'Neal, is no evidence that he thought Massey was shooting at him.

In *Preston v. State*, 756 S.W.2d 22 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd), the defendant testified that he told the victim to turn his music down, then later told him to leave his house. The victim stood and moved to leave, and Preston shot and killed him. In seeking a self-defense instruction, Preston testified that he "wasn't going to take any chances with [the victim] . . . shooting [him] with [his] own pistol." *Id.* at 23. He added that he thought the victim must be "crazy" for not following Preston's instructions and that Preston feared the victim because the victim was "just as big as" Preston and had a fuller beard than Preston. *Id.* "The mere fact that the accused 'believed' the complainant might in some manner attack the accused, without evidence of any overt act or words that would lead the accused to *reasonably* believe he

---

[15]The trial court instructed the jury on self-defense but not on whether Dickey was entitled to a defensive instruction on multiple assailants. *Dickey*, 22 S.W.3d at 492. The court of appeals reversed, finding an instruction on multiple assailants should have been given. *Dickey v. State*, 979 S.W.2d 825, 829 (Tex. App.—Houston [14th Dist.] 1998), *rev'd by* 22 S.W.3d 490 (Tex. Crim. App. 1999). The only issue on discretionary review was whether Dickey was harmed by the absence of the instruction on multiple assailants, and the Texas Court of Criminal Appeals found that he was not. *Dickey*, 22 S.W.3d at 493.

was in danger, is insufficient to give rise to a right to an instruction and charge on self-defense."
*Id.* at 25.[16]

There was no evidence that Massey posed any threat of deadly force to O'Neal or that O'Neal perceived any such threat from Massey. That night, O'Neal did not know who the other man in the side-by-side was. The man just sat there throughout the exchanges between O'Neal and Burton. The man, Massey, did not make any threat or threatening move towards O'Neal. Massey was later determined to have been armed with a .22 pistol, but it was found in his pocket. The autopsy showed that Massey had been shot in the back.

Because the evidence did not raise self-defense, O'Neal was not entitled to an instruction on that defense.

We overrule the first point of error.

## IV. O'Neal Waived His Request for an Instruction on Manslaughter

O'Neal next complains that the trial court did not include a jury instruction on the lesser-included offense of manslaughter. At an informal charge conference at the end of the first day of testimony, O'Neal asked for a jury instruction on manslaughter.[17] The next day, after both sides rested and closed evidence, the parties discussed the final charge. O'Neal asked for instructions

---

[16]*See also Oesterick v. State*, 939 S.W.2d 232, 238 (Tex. App.—Austin 1997, pet. ref'd) (The defendant followed his ex-girlfriend and a friend to another friend's house. *Id.* at 234. The first friend, a high school baseball player, picked up a bat and told the defendant to go home; the defendant fired a .22 rifle at the friend's feet. *Id.* There was no evidence that the bat-wielding friend "used or attempted to use the baseball bat in a way that could be the basis of a reasonable belief by [Oesterick] that his use of deadly force was immediately necessary." *Id.* at 238).

[17]O'Neal told the court, "I was just going to ask for the lesser-included manslaughter." The trial court asked counsel to provide "something . . . as far as some wording and such, even if it comes from the pattern [jury] charges." Other matters, such as self-defense, were discussed, and the trial court made no rulings on any requests. The court then said, "Well, we've all got a little bit of work to do tonight" and instructed the parties to be ready to work at 8:30 the next morning.

on self-defense and defense of others. He made no reference to an instruction on the lesser-included offense of manslaughter.

In *Lopez v. State*, 860 S.W.2d 938 (Tex. App.—San Antonio 1993, no pet.), the defendant, charged with capital murder, asked for a charge instruction on attempted voluntary manslaughter. The trial court denied the request. *Id.* at 941. After the charge was prepared and presented to the parties, the trial court then asked the defense, "Do you have any additional requested instructions?" *Id.* Defense counsel stated, "As finally drafted, we have no objection to the charge." *Id.* The court of appeals found Lopez affirmatively waived his request for the lesser-offense instruction because of the defense counsel's statement, "As finally drafted, we have no objection to the charge." *Id.* at 941–42. "A party . . . can waive affirmatively a prior objection to a jury charge." *Id.* at 941.

In reaching this conclusion, the Fourth Court of Appeals analyzed *Lassere v. State*, 650 S.W.2d 203 (Tex. App.—San Antonio 1983, pet. ref'd). Lassere requested that the charge contain a definition of "effective consent."[18] The trial court, though, said, "Okay. We will leave it [the instructional definition of theft] like it is . . . ." *Id.* at 208 (alteration in original). Defense counsel answered, "Okay." *Id.* The court of appeals found Lassere waived his objection. *Id.*

The *Lopez* court contrasted *Rasmussen v. State*, 608 S.W.2d 205 (Tex. Crim. App. [Panel Op.] 1980). There, Rasmussen objected that the charge did not include an instruction on a lesser-included offense. *Id.* at 211 (op. on reh'g). The court asked Rasmussen, "Do you have any further objections to the charge?" *Id.* The defense attorney replied, "No further objections."

---

[18]Lassere was convicted of aggravated robbery.

17

*Id.* The *Rasmussen* court held that defense counsel's statement did "not constitute an express waiver of objections previously perfected in compliance with" Article 36.15 of the Texas Code of Criminal Procedure.[19] *Id.*

Here, at a preliminary charge discussion after the first day of testimony, O'Neal asked for an instruction on the lesser-included offense of manslaughter. The court invited O'Neal to submit language for such an instruction, and there is no evidence in the record that O'Neal proffered any such language. He made no reference to the lesser-included-offense instruction at the final charge conference. We hold that O'Neal waived his request for the lesser-included-offense instruction and did not preserve anything for our review.[20] We overrule the second point of error.

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:   March 28, 2023
Date Decided:    May 31, 2023

Do Not Publish

---

[19]Rasmussen also "dictated an objection to the court's charge." *Rasmussen*, 608 S.W.2d at 211; *see* TEX. CODE CRIM. PROC. ANN. art. 36.15.

[20]"[L]esser-included instructions are like defensive issues and . . . a trial court is not statutorily required to *sua sponte* instruct the jury on lesser-included offenses because these issues 'frequently depend upon trial strategy and tactics.'" *Tolbert v. State*, 306 S.W.3d 776, 780 (Tex. Crim. App. 2010) (quoting *Delgado v. State*, 235 S.W.3d 244, 249–50 (Tex. Crim. App. 2007)).